**TEXAS CRUSHED STONE COMPANY, Parker Lafarge, Inc., and Gulf Coast Limestone, Inc., Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Vulcan Materials Company, Calizas Industriales del Carmen, S.A., and Vulcan–ICA Distribution Company, Defendant–Intervenors.**

Court No. 92–08–00559.

United States Court of International Trade.

May 25, 1993.

Stewart & Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., and Lane S. Hurewitz, Washington, DC, for plaintiffs.

Office of Gen. Counsel, U.S. Intern. Trade Com'n, Lyn M. Schlitt, Gen. Counsel, Judith M. Czako, Acting Asst. Gen. Counsel and George W. Thompson, Atty.–Advisor, Washington, DC, for defendant.

Covington & Burling, Harvey M. Applebaum, O. Thomas Johnson, Jr., Thomas O. Barnett, and Thomas A. Robertson, Washington, DC, for defendant-intervenors.

### OPINION

CARMAN, Judge:

Pursuant to Rule 56.1 plaintiffs move for judgment upon the agency record. Plaintiffs contest the negative preliminary determination of the International Trade Commission, in its investigation in *Crushed Limestone from Mexico*, 57 Fed.Reg. 31,386 (1992). This action is brought pursuant to 19 U.S.C. § 1516a(a)(1)(C) (1988) and 28 U.S.C. § 1581(c) (1988).

### BACKGROUND

Texas Crushed Stone Co., Parker LaFarge Inc., and Gulf Coast Limestone, Inc. (plaintiffs) filed a petition on May 20, 1992 with the ITC and Commerce alleging that an industry in the United States was materially injured or threatened with material injury by reason of imports of crushed limestone from Mexico at less than fair value. The ITC conducted a preliminary investigation. *Crushed Limestone from Mexico*, 57 Fed.Reg. 22,255 (1992). Based on the information obtained during the investigation, the five participating Commissioners reached a negative preliminary determination.[1] *Crushed Limestone from Mexico*, 57 Fed.Reg. 31,386 (1992). The Commission's views and a public version of the staff report are set forth in *Crushed Limestone from Mexico*, USITC Pub. 2533, Inv. No. 731–TA–562 (Preliminary) (July 1992) (AR Doc. 57).

All of the Mexican crushed limestone at issue originated at the Yucatan Peninsula quarry of defendant-intervenor Calizas Industriales del Carmen, S.A. and was imported into the United States by defendant-intervenor Vulcan/ICA Distribution Company. AR Doc. 57 at I–13. Defendant-intervenor Vulcan Material Company is a domestic operator of limestone quarries throughout the United States, including the Southeastern Texas region, and owns interests in Calica and Vulcan/ICA through one of its wholly owned subsidiaries. AR Doc. 1 (Petition) at 11, *citing* Collective Exhibit 5 (Vulcan 1990 Form 10–K) at 50. Vulcan/ICA began to import crushed limestone into the U.S. market for use as construction aggregate in 1990.

In addressing the first issue of the definition of "like product," the Commissioners adopted plaintiffs' definition which included crushed limestone and excluded limestone flux, cement kiln feed, limestone used for the manufacture of lime, and agricultural limestone. AR Doc. 57 at 4–9, 17–18. The Commission also adopted the region of seventy-five counties in Southeast Texas proposed by plaintiffs in order to consider the case on a regional industry basis within the meaning of 19 U.S.C. § 1677(4)(C) (1988). AR Doc. 57 at 11–13.

The Commission next determined that there was not a concentration of dumped imports into the regional market. AR Doc.

---

1. Chairman Newquist recused himself from this investigation. The Commission majority was composed of Vice Chairman Watson and Commissioners Brunsdale and Crawford. Commissioners Rohr and Nuzum issued concurring views.

57 at 14. In making this determination, the Commission stated that "[w]hile the statute does not define concentration, the Commission generally has found concentration of dumped imports at or above 80 percent of total imports into the United States to meet the statutory criterion." AR Doc. 57 at 13 (footnote omitted). The Commission noted that in 1990, 55.1 percent of imports from Mexico were imported into the region; in 1991, 59.6 percent; and in the period January through March 1992, 54.3 percent. AR Doc. 57 at 13–14. The majority and concurring Commissioners concluded that these levels of imports did not satisfy the statutory concentration requirement. AR Doc. 57 at 13–14, 22–23. The Commission declined to consider concentration on plaintiffs' proposed alternative basis of import market share because the evidence before them demonstrated that imports were not dispersed widely throughout the country. AR Doc. 57 at 14.

Because the Commission determined that imports were not concentrated in the market, the majority did not reach the issue of material injury or threat thereof to the producers of all or almost all of the production within the market. The majority stated that a finding of import concentration was a legal prerequisite to an analysis of whether the producers of all or almost all of the production within the market were being materially injured or threatened by material injury. AR Doc. 57 at 15. The concurring commissioners on the other hand, reached the issue and stated the following:

> Having determined that the condition precedent, import concentration, to an affirmative injury finding in a regional industry investigation is lacking, we are compelled to conclude that there is no reasonable indication that producers of all or almost all of regional production are being materially injured or threatened with material injury by reason of the allegedly unfair Mexican imports.

AR Doc. 57 at 23.

## CONTENTIONS OF THE PARTIES

Plaintiffs first argue that the ITC used an unlawful interpretation of 19 U.S.C. § 1677(4)(C) in making its negative prelimi-nary determination. Plaintiffs read the statute and its legislative history as requiring the Commission to use a "ratio of import penetration analysis," an analysis plaintiffs claim the Commission abandoned in this case.

The second argument raised by plaintiffs is that the Commission departed from its prior practice by applying a higher numerical benchmark and by only using the percent of imports analysis. Plaintiffs claim that in past determinations the Commission not only used a lower numerical benchmark, but that it viewed import concentration alternatively in terms of a percentage of national imports (the percent of imports analysis) or of the relative market share (ratio of import penetration analysis).

Plaintiffs next contend the Commission misapplied the preliminary injury standard in its investigation. They claim the "ITC failed to apply the proper legal standard in the context of a preliminary determination, to wit: 'whether there is a reasonable indication that' an industry is materially injured or threatened with injury by reason of dumped imports. 19 U.S.C. § 1673b(a)." Plaintiffs' Brief at 36. Plaintiffs argue the Commission ignored evidence on the record which indicated there was a higher import concentration ratio in the Southeast Texas region than in the United States as a whole. Due to this arbitrary and capricious application of the facts, plaintiffs argue that the Commission improperly failed to proceed to a final determination.

Plaintiffs' final argument is that the Commission's finding, that there was no reasonable indication that the Southeast Texas crushed limestone industry was threatened with material injury by reason of the subject imports, was an abuse of discretion and not in accordance with law. According to plaintiffs, the Commission failed to consider extensive evidence on the administrative record which demonstrated a threat of material injury, such as: (1) Vulcan's stated intention for expanded import volume in 1992 and beyond; (2) the geographic proximity of the Southeast Texas region to the Mexican facility; and (3) the massive entry of the highest proportion of the Mexican product into the ports of the

Southeast Texas region prior to the initiation of the investigations. Plaintiffs' Brief at 5–6.

Defendants argue the Commission's negative preliminary determination should be affirmed. Defendants respond to plaintiffs' first argument by stating that the Commission's interpretation of 19 U.S.C. § 1677(4)(C) was reasonable. Defendants argue that the legislative history of the provision indicates that the Commission has discretion in choosing its method for determining import concentration, and the Commission is not required to choose any particular method in its investigation. Secondly, defendants point out that neither the antidumping statute generally, the regional industry provision, nor Commission practice, binds the Commission to a precise numerical cut-off in analyzing whether import concentration is present.

Contrary to plaintiffs' assertion that the Commission failed to apply the correct legal standard and ignored evidence on the record, defendants argue that the Commission in fact considered the complete record under the appropriate legal standard in considering the issue of import concentration. Based on this full consideration, defendants assert that there was no reason for the Commission to believe that contrary evidence would arise in any final investigation. Thus, defendants claim it was unnecessary to proceed to a final investigation to consider the issue of material injury.

Defendants argue that plaintiffs' fourth and final argument is irrelevant. According to defendants, the Commission is not required to consider whether there is a threat of import concentration, either in a preliminary or a final determination. Therefore, defendants urge that there was no need for the Commission to consider the statutory threat factors that plaintiffs discuss in their brief.

### STANDARD OF REVIEW

"If ITC's negative determination, however reached, was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 19 U.S.C. § 1516a(b)(1)(A), the court should overturn it. If ITC's negative determination cannot be held defective on any of those grounds, the court should not overturn it." *American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 58, 785 F.2d 994, 1004 (1986).

The arbitrary and capricious standard has been defined by the Supreme Court in the following manner:

> Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct.1340, 43 L.Ed.2d 433 (1975) (citations omitted).

Additionally, "if the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984) (footnote omitted).

### DISCUSSION

In the course of an antidumping investigation, the ITC must determine whether, based on the best information available at the time of the determination, there is a reasonable indication of material injury or threat thereof to an industry in the United States by reason of the subject imports. 19 U.S.C. § 1673b(a) (1988). When defining "industry," the Commission may conduct a regional analysis as provided in the following statutory language:

### Regional Industries

In appropriate circumstances, the United States, for a particular product market, may be divided into 2 or more markets and

the producers within each market may be treated as if they were a separate industry if—

(i) the producers within such market sell all or almost all of their production of the like product in question in that market, and

(ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

In such appropriate circumstances, material injury, the threat of material injury, or material retardation of the establishment of an industry may be found to exist with respect to an industry even if the domestic industry as a whole, or those producers whose collective output of a like product constitutes a major proportion of the total domestic production of that product, is not injured, if there is a concentration of subsidized or dumped imports into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured or threatened by material injury, or if the establishment of an industry is being materially retarded, by the reason of the subsidized or dumped imports.

19 U.S.C. § 1677(4)(C) (1988).

■ The statute sets up three prerequisites which must be satisfied before the Commission can reach an affirmative determination under a regional industry analysis. The Commission must determine that there is: (1) a regional market satisfying the requirements of the statute, (2) a concentration of dumped imports into the regional market, and (3) material injury or threat thereof to producers of all or almost all of the regional production, or material retardation to the establishment of an industry due to the subsidized or dumped imports. The Commission will move on to the next step only if each preceding step is satisfied. In this case the Commission initially determined the region proposed by plaintiffs satisfied the criteria of the statute, then next determined there was not a concentration of dumped imports into the regional market. AR Doc. 57 at 13–14.

*Legislative History*

■ Plaintiffs first argue that the Commission failed to use the "ratio of import penetration analysis" in its determination as is required by both 19 U.S.C. § 1677(4)(C) and its legislative history. Instead the Commission used only the "percent of imports analysis." These two methods of measuring whether imports are concentrated in a given region were described in the defendant's brief as follows:

PERCENT OF IMPORTS ANALYSIS: The Commission considers the percentage of all subject imports that are imported into the region; if the region accounts for a sufficiently large percentage of all the subject imports in light of the facts of the case, the Commission will find that the imports are concentrated and proceed with a regional industry analysis.

RATIO OF IMPORT PENETRATION ANALYSIS: The Commission considers whether import penetration in the region is relatively higher than import penetration in the United States as a whole. The Commission has typically considered this alternate way of measuring concentration only in particular circumstances, such as when the imports outside the region are widely dispersed throughout the rest of the country or when the regional industry accounts for a significant portion of the total national industry, and only after considering concentration under the percentage of imports analysis.

Defendant's Brief at 16.

The Court does not agree with plaintiffs' interpretation of either the statute or its legislative history. As plaintiffs themselves point out, the statute does not define the terms "concentration" or "import concentration." Plaintiffs' Brief at 15. Furthermore, the statute does not specifically refer to either of the two tests at issue. Thus it cannot be said that the statute by its language requires the Commission to analyze every concentration issue based on the ratio of import penetration analysis.

In addition, the legislative history cited by plaintiff does not compel the Commission to use the relative market share test in every

case. Plaintiffs point to a Senate Report which states the following:

> The requisite concentration will be found to exist in at least those cases where the ratio of the subsidized, or less-than-fair-value, imports to consumption of the imports and domestically produced like product is clearly higher in the relevant regional market than in the rest of the U.S. market.

S.Rep. No. 249, 96th Cong., 1st Sess. 83 (1979), U.S.Code Cong. & Admin. News 1979, pp. 381, 469. A House Report, however, states "concentration *could be* found to exist if the ratio of such imports to consumption is clearly higher in the regional market than in the rest of the U.S. market." H.R.Rep. No. 317, 96th Cong., 1st Sess. 73 (1979) (emphasis added). Similarly, the 1979 Statements of Administrative Action, which were explicitly approved by Congress, use permissive, as opposed to mandatory, language:

> In such case, injury may be found if there is material injury, threat of material injury or material retardation of the establishment of an industry to the producers producing all or almost all of the production within the market and if the subsidized or dumped imports are concentrated in such market. (statute) Concentration of subsidized or dumped imports *could be* found to exist if there is a clearly higher ratio of such imports to consumption in such market than the ratio of such imports to consumption in the remainder of the United States market. (practice).

H.R.Doc. No. 153, Part II, 96th Cong., 1st Sess. 388, 432 (1979) (emphasis added).

The legislative history of 19 U.S.C. § 1677(4)(C) was recently analyzed by this Court in *Mitsubishi Materials Corp. v. United States,* 17 CIT ——, 820 F.Supp. 608 (1993). In addressing the issue of whether the Commission properly utilized the relative market share test, (ratio of import penetration analysis), the Court analyzed the legislative history of the Trade Agreements Act of 1979. *Id.* at ——. While the Court stated that the legislative history of the Act "clearly envisioned utilization of a test of this nature," it did not indicate that such a test

was mandated by the statute or legislative history. *Id.*

Plaintiffs state in their brief that the only difference between the House Report and the Senate Report is a minor difference concerning emphasis. Plaintiffs' Brief at 18 n. 5. The Court, however, views the difference as illustrating inconsistent statements concerning the application of the relative market share test. While the language from the Senate Report is arguably mandatory, the language in the House Report and Statements of Administrative Action is clearly permissive. The drafters of 19 U.S.C. § 1677(4)(C) could have resolved the discrepancy by explicitly mandating within the statute the test the Commission must use. Instead, the statute is silent with respect to mandatory methods of analysis, leaving the Court to conclude that Congress intended for the Commission to exercise its discretion in this fact specific area of analysis.

In the past Congress has indicated its intention for determinations to be made on a case by case basis. For example, while considering amendments to the antidumping act in 1974, the Senate made the following statement with respect to regional industries:

> The Committee agrees with the geographic segmentation principle in antidumping cases. However, the Committee believes that each case may be unique and does not wish to impose inflexible rules as to whether injury to regional producers always constitutes injury to an industry.

S.Rep. No. 1298, 93d Cong., 2d Sess. 181 (1974). This statement demonstrates the fact that Congress did not want to straightjacket the Commission in its method of analyzing cases before it. Furthermore, the Commission has continued to apply the percentage of imports test since 1979. Although Congress has twice amended the antidumping statute, in 1984 and again in 1988, it has on each occasion chosen to leave the import concentration requirement undisturbed.

*American Lamb* requires a "clearly discernible legislative intent" to overturn agency interpretation. 4 Fed.Cir. (T) at 54, 785 F.2d at 1001. Based on the inconsistency in legislative intent, Congressional recognition of the need for a case by case method of analysis,

and the fact that Congress has twice passed up the opportunity to express displeasure with the Commission's practice, this Court holds that the Commission was within its discretion in applying the percentage of imports test.

### Prior Commission Practice

Plaintiffs claim that the Commission's use of the percentage of imports test is inconsistent with prior determinations. The Commission applied the percent of imports analysis in the underlying investigation, and determined that the percentage of imports into the region was insufficient to be considered concentrated. The Commission also determined that the circumstances for application of the ratio of import penetration analysis were not present in light of the facts gathered in the investigation. In the case at hand, subject imports outside the defined region were not widely dispersed throughout the United States, "but [were] found overwhelmingly in the 10–state Mississippi River/Gulf Coast region that was identified by [intervenors]." AR Doc. 57 at 14. Due to the lack of national dispersion, the Commission used the percentage of imports test and declined to use plaintiffs' ratio of import penetration analysis.

In his oral argument, counsel for plaintiffs cited to Gray Portland Cement in support of the position that the Commission must use the ratio of import penetration test in all regional market cases. In particular, counsel quoted the following passage from the views of then Acting Chairman Brunsdale:

> While Congress may not have intended that the Commission consider only the regional concentration of imports relative to regional consumption, the legislative history cited by petitioner suggests that Congress may have intended that the Commission would take such a measure into account.

Gray Portland Cement and Cement Clinker from Japan, USITC Pub. 2297, Inv. No. 731–TA–461 (Preliminary) at 15 (1990) (footnote omitted) (emphasis added); Transcript of Oral Argument at 44 (April 15, 1993). This is hardly the "must" language that counsel held it out to be in oral argument. Although Acting Chairman Brunsdale raises the possibility that the ratio of importation test could be required, she does not reach a conclusion and her comments indicate she viewed use of the test as merely permissive. In fact, her later language shows that she did not make a conclusive determination regarding this issue: "I expect, however, additional argument from the parties as to which analysis is appropriate, so that I may revisit the issue in any final investigation." Gray Portland Cement, USITC Pub. 2297 at 16. Thus, she used the ratio of import penetration test in this situation, but did not indicate she felt compelled to use the test, nor did she state the test must be used in all regional determinations.

A recent opinion by this Court lends support to the Commission's position, which is essentially that it has the discretion to apply either the percent of imports test or the relative market share test or both as seems appropriate to it based on the circumstances of each particular case. Mitsubishi Materials, 17 CIT at ——. The Mitsubishi court cited with approval language from the Crushed Limestone from Mexico Preliminary Determination. This language noted the Commission's discretion in deciding whether to base its determination on the ratio of import concentration test: "the Commission reiterated that it maintained 'discretion to analyze import concentration' based upon market share." Mitsubishi Materials, 17 CIT at —— (quoting Crushed Limestone from Mexico, AR Doc. 57 at 14). This Court holds that the Commission has reasonably interpreted 19 U.S.C. § 1677(4)(C) as giving the Commission discretion in analyzing regional import concentration.

Plaintiffs next argue that even if the Commission applied the appropriate analysis, the negative preliminary determination was still arbitrary and capricious due to the fact regional imports exceeded fifty percent of all U.S. imports from Mexico. Plaintiffs claim prior Commission practice used lower numerical benchmarks which, if applied in this case, would encompass the amount of regional imports in the Southeast Texas region.

Plaintiffs fail to realize that Congress did not want to establish rigid numerical stan-

dards. Instead, Congress intended for the ITC to base its determinations on the particular facts of each case. This practice was cited with approval by this Court in *Cemex, S.A. v. United States*, 16 CIT ——, 790 F.Supp. 290 (1992), *aff'd*, 989 F.2d 1202 (Fed. Cir.1993).

In short, there is nothing in the statute, case law, or administrative practice to indicate Congressional intent to bind ITC to a precise numerical percentage. Indeed the legislative history in the analogous context of a nationwide investigation indicates that Congress intended determinations to be made on a case-by-case basis.

16 CIT at ——, 790 F.Supp. at 294. Plaintiffs cite this very language at page 33 of their brief, yet insist on arguing that the amount of import concentration in this case must fit within particular percentages found in past determinations.

In their brief, plaintiffs rely on *Certain Steel Wire Nails from the Republic of Korea*, USITC Pub. 1088, Inv. No. 731–TA–26 (Final) (1980). Plaintiffs contend that because this is one of the initial determinations the Commission made after Congress enacted the Trade Agreements Act of 1979, it is evidence of the intent of the statute. As evidence of the intent of the statute, however, this determination includes language that actually refutes plaintiffs' argument: "because cases before the Commission are likely to involve different factual circumstances, a precise mathematical formula will not always be reliable in determining the minimum percentage which constitutes sufficient concentration." *Id.* at 11 (footnote omitted). *See also Mitsubishi Materials*, 17 CIT at —— (quoting with approval the above language from *Steel Wire Nails from Korea*). While the Commission found shipments of 43 percent to be a concentration of the imports at issue in *Steel Wire Nails from Korea*, it made clear that this figure was not a benchmark to be followed in every case. Congress wanted to provide flexibility, not a 43 percent benchmark.

Another case cited by plaintiffs illustrates how widely the amount of imports may vary when the Commission bases its determinations on the unique facts of each particular case. "In determining whether there is the requisite concentration of imports within the region, the Commission has 'found the requisite concentration at levels as low as 68 percent and 43 percent.'" Plaintiffs' Brief at 29 (quoting *Nepheline Syenite from Canada*, USITC Pub. 2415, Inv. No. 731–TA–525 (Prelim.) at 19 (Aug. 1991)). This broad range of concentration levels further demonstrates the flexibility the Commission has had in determining the issue of import concentration. The Commission needs discretion in this area to effectively carry out the requirements of 19 U.S.C. § 1677(4)(C), and Congress intended for the ITC to have such discretion.

### Reasonable Indication Standard

■ Plaintiffs contend that Census Bureau data on the record demonstrated that the percentage of imports into the region was increasing, contrary to the questionnaire data. Therefore, the Commission should have continued the investigation because imports in the region might have increased sufficiently to be considered concentrated by the time of a final determination. The Court finds plaintiffs' argument unpersuasive.

The standard applicable to the Commission in conducting preliminary antidumping and countervailing duty investigations is articulated in 19 U.S.C. § 1673b(a) (1988). This provision states, in relevant part:

> [T]he Commission ... shall make a determination, based upon the best information available to it at the time of the determination, of whether there is a *reasonable indication* that—
>
> (1) an industry in the United States—
>
> (A) is materially injured, or
>
> (B) is threatened with material injury, or
>
> (2) the establishment of an industry in the United States is materially retarded,
>
> by reason of imports of the merchandise which is the subject of the investigation by the [Department of Commerce].

(Emphasis added). *American Lamb* upheld the Commission's practice of making negative determinations under the "reasonable indication" standard in preliminary investigations when: "(1) the record as a whole con-

tains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation." *American Lamb,* 4 Fed.Cir. (T) at 55, 785 F.2d at 1001 (1986).

Plaintiffs argue that the Commission violated the second requirement of *American Lamb,* that there be "no likelihood.... that contrary evidence will arise in a final investigation." *Id.* at 55, 785 F.2d at 1001. *American Lamb,* however, points out that "[t]he statute calls for a reasonable indication of injury, not a reasonable indication of need for further inquiry." *Id.* In this case, the Commission based its concentration analysis on a complete record. Based on this complete record, there was no reason for the Commission to believe that contrary evidence would arise in a final investigation. Plaintiffs do not contend that further investigation would produce contrary evidence, but rather that the concentration level is likely to change by the time of the final determination. In fact, plaintiffs never argued before the Commission that the import data were incomplete, incorrect, or were otherwise insufficient to allow the Commission to make a determination concerning concentration.

Plaintiffs argue the Commission ignored evidence on the record which indicated that defendant-intervenors attempted "to obscure the volume of imports being brought into the Southeast Texas region in order to decrease the import concentration ratio." Plaintiffs' Brief at 43. Plaintiffs claim evidence on the record shows defendant-intervenors knew that an antidumping duty investigation would likely be instituted before the petition was actually filed. *Id.* (citing AR Doc. 44 (Petitioners' Post–Conference Brief) at 23, Collective Exhibit 15 (Vulcan Letter of 5/26/92 at 2)).

This argument amounts to pure conjecture. There is no evidence indicating the defendant-intervenors knew when a petition would be filed; only plaintiffs knew what their own schedule was for filing their petition. Even if the defendant-intervenors surmised that a

petition would be filed, they would not have known that the investigation would be based on a regional industry analysis or what the regional boundaries would be. Plaintiffs base this contention of artificially depressed imports on Census Bureau data which indicated import concentration in the Southeast Texas region was 74.7 percent in the first two months of 1992, compared with 54.3 percent for the first three months of 1992. AR Doc. 1 (Petition) at 48 (Table 23). The Census Bureau data was on the record as was the Commission's questionnaire data. The Commission is entitled to resolve conflicts in the evidence at the preliminary stage under *American Lamb* and, in this case, relied on the questionnaire data as being more reliable.

The Commission must be allowed to weed out those cases that are lacking in merit. It could not successfully accomplish this task if it were forced to proceed to a final determination "whenever it finds a mere 'possibility' of injury in the petition and accompanying information." *American Lamb,* 4 Fed.Cir. (T) at 56, 785 F.2d at 1002. Plaintiffs are not left without remedy. If in fact concentration did change to an appropriate level, then plaintiffs could file a new case.

### Material Injury

Plaintiffs contend the Commission erred by basing its negative preliminary determination only on evidence of lack of concentration. According to plaintiffs, the Commission should have also examined factors relevant to injury and causation.

The Commission majority did not reach the issue of material injury in this case.[2] As discussed above, 19 U.S.C. § 1677(4)(C) sets up three prerequisites which must be satisfied before the Commission can reach an affirmative determination under a regional industry analysis. In this case the Commission determined that the first criteria, that there be a regional market meeting the requirements of the statute, was satisfied. The second criteria, that there be a concentration of dumped imports into the regional market, was not satisfied. Therefore, the Commis-

---

2. The concurring commissioners did reach the material injury issue. However, they dealt with the issue in a conclusory fashion, stating that due

to a lack of concentration, they were "compelled to conclude" there was no material injury or threat of material injury. AR Doc. 57 at 23.

sion could not proceed to the third criteria, that there be material injury or threat thereof to producers of all or almost all of the regional production, or material retardation to the establishment of an industry due to the subsidized or dumped imports. Because the Commission did not consider material injury, there was no need to examine evidence relevant only to that issue.

### CONCLUSION

After considering all of plaintiffs' arguments, the Court holds that the Commission's negative preliminary determination was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Therefore, the Court denies plaintiffs' motion and sustains the International Trade Commission's negative preliminary determination in *Crushed Limestone from Mexico*, 57 Fed.Reg. 31,386 (1992). This action is dismissed.