## COMMITTEE FOR FAIRLY TRADED VENEZUELAN CEMENT, Plaintiff–Appellant,

v.

## UNITED STATES, Defendant–Appellee,

and

## Cemex Venezuela, S.A.C.A. ("Vencemos"), Defendant–Appellee.

No. 04–1016.

United States Court of Appeals, Federal Circuit.

DECIDED: June 18, 2004.

---

Michael P. Mabile, King & Spalding LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Joseph W. Dorn. Of counsel was J. Michael Taylor.

Robin L. Turner, Attorney, United States International Trade Commission, of Washington, DC, argued for defendant-appellee United States. With her on the brief was Lyn M. Schlitt, General Counsel,

and James M. Lyons, Deputy General Counsel.

Irwin P. Altschuler, Greenberg Traurig, LLP, of Washington, DC, argued for defendant-appellee Cemex Venezuela, S.A.C.A. ("Vencemos"). With him on the brief was Jeffrey S. Neeley. Of Counsel was David R. Amerine, Manatt, Phelps & Phillips, LLP, of Washington, DC.

Before MICHEL, GAJARSA, and PROST, Circuit Judges.

PROST, Circuit Judge.

This case comes to us on appeal from the Court of International Trade. At issue is whether the Court of International Trade correctly upheld the International Trade Commission's ("Commission") decision to terminate suspended antidumping and countervailing duty investigations regarding cement imported from Venezuela. *Comm. for Fairly Traded Venez. Cement v. United States*, 279 F.Supp.2d 1314 (Ct. Int'l Trade 2003) ("*Venezuelan Cement*"). Because the Commission's reasonable interpretation of the relevant Congressional enactments is entitled to *Chevron* deference and because the Commission's determination rested on substantial evidence, we affirm.

## I.  BACKGROUND

### A.

■ Under the statutory scheme devised by Congress, the Commission has the power to consider regional markets (as opposed to the national market) in performing a dumping or countervailing duty investigation. 19 U.S.C. § 1677(4)(C) (2004). In performing a regional markets analysis, the Commission must find:

(1) a regional market satisfying the requirements of the statute,

(2) a concentration of dumped imports into the regional market, and

(3) material injury or threat thereof to producers of all or almost all of the regional production, or material retardation to the establishment of an industry due to the subsidized or dumped imports.

*Tex. Crushed Stone Co. v. United States*, 822 F.Supp. 773, 777 (Ct. Int'l Trade 1993). It is the second step in this analysis that is at issue in this case.

In 1995, the Uruguay Round Agreements Act ("URAA") charged the Commission with conducting "sunset" reviews of suspended antidumping and countervailing duty investigations. 19 U.S.C. § 1675(c)(1)(A) (2004). Under 19 U.S.C. § 1675(c)(1)(A), the Commission uses these "sunset" reviews to analyze whether termination of suspended antidumping and countervailing duty investigations "would be likely to lead to continuation or recurrence of dumping or a counteravailable subsidy (as the case may be) and of material injury." If the termination of such investigations would not lead to material injury, the Commission may terminate the investigation. Further, the focus in such "sunset" reviews is entirely prospective, with the key inquiry being whether termination of suspended investigations "would be likely to lead" to the dumping of foreign imports into a particular market in the future. *See* Statement of Administrative Action to the Uruguay Round Agreements Act of 1994 ("SAA"), H.R. Doc. No. 103–316, at 884 (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040, 4209.[1]

Prior to the URAA, the Commission's regional dumping and countervailing duty investigations were controlled in large part by § 1677(4)(C), which instructed the Commission to determine "if there is a concentration of dumped imports" into a regional market. Because courts deemed the phrase "concentration of dumped imports" ambiguous, the Commission was granted considerable deference in interpreting § 1677(4)(C) prior to the adoption of the URAA. *See, e.g., Tex. Crushed Stone,* 822 F.Supp. at 778–99. Indeed, the Commission could apply either a "percent of imports" test, a "clearly higher" test, or even both in its dumping investigations. *Id.*

The legislative history of the URAA and the SAA established a two-step concentration analysis for regional dumping and countervailing duty investigations. The first step compels the Commission to discern whether "the ratio of subject imports to consumption is *clearly higher* in the regional market than in the rest of the U.S. market." *See* SAA at 860 (emphasis added). The second step requires that the subject imports in the region in question "account for a *substantial proportion* of total subject imports entering the United States." *Id.* (emphasis added). The URAA and the SAA did not change or amend the statutory language of 19 U.S.C. § 1677(4)(C), nor did they purport to define the term "concentration of dumped imports."

### B.

In 1991, the appellant, the Committee for Fairly Traded Venezuelan Cement ("CFTVC") filed a petition with the Commission and the International Trade Administration of the Department of Commerce ("Commerce"), alleging that the United States cement industry was being materially injured by imports of Venezuelan gray portland cement and cement clinker. After a preliminary investigation, the Commission found that the Florida region qualified as a "region" under 19 U.S.C. § 1677(4)(C) and that there was "a reasonable indication that an industry in the United States is materially injured by reason of [cement] imports from Venezuela." *See* Gray Portland Cement and Cement Clinker from Venezuela, 56 Fed. Reg. 32,589 (Int'l Trade Comm'n July 17, 1991). As a result, the Commission instituted a countervailing duty investigation and an antidumping investigation.

Within a year, the Department of Commerce signed agreements with Venezuela suspending the antidumping and countervailing duty investigations. *See* Gray Portland Cement and Cement Clinker from Venezuela, 57 Fed. Reg. 6706 (Dep't Commerce Feb. 27, 1992), Gray Portland Cement and Cement Clinker from Venezuela, 57 Fed. Reg. 9242 (Dep't Commerce Mar. 17, 1992).

In 1999, the Commission began its "sunset" reviews of the suspended antidumping and countervailing duty investigations related to the Florida region Venezuelan cement allegations. At the conclusion of its analysis, the Commission determined that the termination of the suspended investigations "would not be likely to lead to continuation or recurrence of material injury to an industry in the United States

---

1. As the Court of International Trade noted in its opinion, the SAA elaborated on the interpretation and application of the URAA. The SAA further states that, "it is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in [the SAA]." SAA at 656.

**1288**

within a reasonably foreseeable time." *See* Gray Portland Cement and Cement Clinker from Japan, Mexico and Venezuela, 65 Fed. Reg. 65,327 (Int'l Trade Comm'n Apr. 5, 2000). The Commission based its decision on its conclusion that the Venezuelan cement imports did not satisfy the "concentration of dumped imports" requirement of 19 U.S.C. § 1677(4)(C) and that they were not likely to account for a substantial proportion of imports in the Florida region for the foreseeable future.

The CFTVC appealed the Commission's determination to the Court of International Trade. There, the CFTVC argued, *inter alia*, that the URAA and the SAA defined the phrase "substantial proportion" clearly enough to communicate Congress's intent and that "substantial proportion" does not require a concentration of imports above a 50% threshold. Instead, they argued, the 54% 1997–1999 average of Venezuelan cement imports into Florida sufficed to satisfy the "substantial proportion" prong of the URAA and the SAA and that the Commission should have declined to terminate the suspended investigations on that basis alone.

The Court of International Trade rejected the CFTVC's argument on appeal and affirmed the Commission's determination. The court noted that the SAA stated that import concentration analyses should be conducted "on a case-by-case basis ... because cases before [the Commission] are likely to involve different factual circumstances." *Venez. Cement*, 279 F.Supp.2d at 1331 (quoting SAA at 860). The court noted that this standard granted the Commission considerable leeway in determining a "concentration of dumped imports." *Id.* Finally, the court noted that the determination of the Commission could be affirmed because it was supported by substantial evidence. *Id.* at 1334.

The CFTVC now appeals the Court of International Trade's decision to this court. This court has jurisdiction to hear this appeal under 28 U.S.C. § 1295(a)(5).

## II.   DISCUSSION

We "review a decision of the [Court of International Trade] by applying for ourselves the statute's standard of review to the [Commission's] determination." *Co–Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1309 (Fed.Cir.2004). We are obligated to affirm the Court of International Trade's decision unless the Commission's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2004).

### A.

Before this court, the CFTVC resurrects its argument that the URAA and the SAA substantively changed the standards by which the Commission makes determinations to terminate suspended regional antidumping and countervailing duty investigations. In the appellant's view, the SAA and the legislative history require the Commission to first identify whether the subject imports' market share is "clearly higher" in the region than outside the region and, second, whether the imports into that region account for a "substantial proportion" of subject imports. The appellant contends that the word "substantial" permits the Commission to find import concentration where the record indicates less than half of the subject imports enter the region in question. Accordingly, the CFTVC seeks a reversal of the Court of International Trade's decision. The appellant also requests that this court issue further instructions to the Court of Inter-

national Trade to remand the case to the Commission for a reconsideration of its determination based on the appellant's interpretation of the "substantial proportion" test.

### B.

■ Where a statute is ambiguous or Congress intentionally leaves interpretive gaps in the language of a statute, courts must defer to agency interpretations of that statute so long as those interpretations are not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In other words, if Congress has left room for an agency to interpret a statute, courts can only inquire as to whether an agency's construction of that statute is "a reasonable interpretation." *Id.*[2]

■ Section 1677(4)(C) of Title 19 directs the Commission to look for a "concentration of dumped imports" in its regional antidumping and countervailing duty investigations. The interpretation of that phrase is the focal point of this current dispute between the CFTVC and the Commission.

■ On appeal, the appellant argues that the adoption of the URAA and SAA compelled a change in the way the Commission determines a "concentration of dumped imports." The CFTVC further alleges that the Commission wrongly used a 60% benchmark in determining whether there was a "concentration of dumped imports" in this case and that the URAA and the SAA provided clear and unambiguous guidance in interpreting "concentration of dumped imports."

We reject the appellant's arguments. First, the URAA and the SAA did not purport to change the language of § 1677(4)(C). Furthermore, neither the language of § 1677(4)(C) nor the legislative history requires this court to adopt a specific construction of "concentration of dumped imports." Second, the Commission explicitly noted in its determination that the SAA "cautions that there is no 'benchmark' for determining what constitutes concentration"—and there is no evidence that the Commission used any benchmark whatsoever in coming to its determination. Gray Portland Cement and Cement Clinker from Japan, Mexico and Venezuela, USITC Pub. 3361, Inv. No. 303–TA–21 and 731–TA–451, –461 and – 519, at 24 (Oct. 2000) (*"Commission Views"*).

The URAA and the SAA neither amend nor refine the language of § 1677(4)(C). In fact, they merely suggest, without disqualifying other alternatives, a "clearly higher/substantial proportion" approach. Indeed, the SAA specifically mentions that

---

2. Our analysis also conforms with the Supreme Court's opinion in *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). As the Court said in *Mead,*

[I]t can still be apparent from [an agency's] generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law ... When circum-

stances implying such an expectation exist, a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity.

*Id.,* at 229, 121 S.Ct. 2164. The authority conferred upon the ITC by 19 U.S.C. § 1677(4)(C) implies just such a delegation by Congress.

no "precise mathematical formula" or " 'benchmark' proportion" is to be used for a dumping concentration analysis. SAA at 860 (citations omitted); *see also Venez. Cement,* 279 F.Supp.2d at 1329–30. Furthermore, as the Court of International Trade noted, the SAA emphasizes that the Commission retains the discretion to determine concentration of imports on a "case-by-case basis." SAA at 860. Finally, the definition of the word "substantial" undercuts the CFTVC's argument. The word "substantial" generally means "considerable in amount, value or worth." *Webster's Third New International Dictionary* 2280 (1993). It does not imply a specific number or cut-off. What may be substantial in one situation may not be in another situation. The very breadth of the term "substantial" undercuts the CFTVC's argument that Congress spoke clearly in establishing a standard for the Commission's regional antidumping and countervailing duty analyses. It therefore supports the conclusion that the Commission is owed deference in its interpretation of "substantial proportion." The Commission clearly embarked on its analysis having been given considerable leeway to interpret a particularly broad term.

In addition, the CFTVC advances an argument without a consequence in this case. As the record indicates, the concentration of Venezuelan imports into the Florida market was steadily declining by the time of the Commission's "sunset" review in 1999, and the proportion of Venezuelan imports directed at the Florida market dropped to 45% in that same year. The Commission relied on these facts to arrive at its determination. The appellant is undoubtedly correct in asserting that the Commission *may* find a "substantial proportion" of subject imports even if the proportion of such imports in a regional market totals less than 50% (as it did in 1999 for Venezuelan cement in the Florida region). This, however, is far different from asserting that the Commission *must* find a "substantial proportion" of subject imports when the proportion of subject imports totals less than 50%. Nothing in the relevant statutes or legislative history supports that assertion.

Given the leeway that Congress gave the Commission in the SAA and in § 1677(4)(C) to determine a "concentration of dumped imports," it is clear that this court must apply *Chevron* deference to any Commission interpretation of that phrase. Thus, the only inquiry left to this court is whether or not the Commission's interpretation of the relevant statutes in this case was "arbitrary, capricious, or manifestly contrary to [§ 1677(4)(C), the URAA, or the SAA]."

A review of the Commission's determination in this case supports the assertion that the Commission reasonably interpreted relevant Congressional statutes in terminating the suspended Venezuelan cement antidumping and countervailing duty investigations. The Commission applied its "substantial proportion" analysis in light of the SAA's disavowal of the use of a "precise mathematical formula" or any particular "benchmark" percentage. *Commission Views* at 23–24. Noting that the law urged case-by-case analyses, the Commission proceeded to review the evidence regarding Venezuelan cement imports into the Florida region. *Id.*

The Commission engaged in an examination of the suspended Venezuelan cement investigations to determine if termination of those investigations *"would be likely to* lead to continuation or recurrence of dumping or a counteravailable subsidy (as the case may be) and of material inju-

ry." 19 U.S.C. § 1675(c)(1)(C) (2004) (emphasis added); *see generally Commission Views.* The Commission found that Venezuelan cement imports into the Florida region "are not likely to account for a substantial proportion of total U.S. imports of cement from Venezuela in the reasonably foreseeable future if the suspended investigations are terminated." *Commission Views* at 30. As a result, the Commission found that imports of Venezuelan cement were "not likely to be sufficiently concentrated to satisfy the import concentration requirement for a regional industry analysis." *Id.* The Commission based its conclusions on several findings. First, it noted that the total percentage of Venezuelan cement imports into the Florida region steadily declined from 64% in 1997 to 53% in 1998 to 45% in 1999—all in the period *after* the suspension of the antidumping and countervailing duty investigations. *Id.* at 26. And it further found that during that same period Venezuelan cement imports were increasing in U.S. markets outside of the Florida region. The record thus supports the conclusion that, in this case, the Commission reasonably determined that imports of Venezuelan cement were unlikely to comprise a "substantial proportion" of Venezuelan cement imported into the United States. That determination evidenced a reasonable interpretation and application of the "substantial proportion" test as defined in the SAA. Therefore, the Commission's determination was made in accordance with § 1677(4)(C), the URAA, and the SAA.

## C.

Given the extensive evidence that the Commission cited in its decision, we do not reverse the Commission determination for lack of substantial evidence under 19 U.S.C. § 1516a(b)(1)(B)(i).

## III. CONCLUSION

Because the Commission's decision to terminate the suspended antidumping and countervailing duty investigations at issue in this case was supported by substantial evidence and in accordance with law, we affirm the decision of the Court of International Trade.

*AFFIRMED.*