**Slip Op. 03-95**

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| COMMITTEE FOR FAIRLY TRADED VENEZUELAN CEMENT, | : | |
| *Plaintiff,* | : | |
| v. | : | |
| UNITED STATES, | : | Court No. 00-12-00547 |
| *Defendant,* | : | |
| and | : | |
| CEMEX VENEZUELA, S.A.C.A. ("VENCEMOS"), | : | |
| | : | |
| *Defendant-Intervenor.* | : | |

[Plaintiff's USCIT R. 56.2 motion for judgment upon the agency record is denied.]

Decided: July 28, 2003

King & Spalding LLP (Joseph W. Dorn and Michael P. Mabile), for Plaintiff.

Lyn M. Schlitt, General Counsel; James M. Lyons, Deputy General Counsel; (Robin L. Turner), Office of the General Counsel, United States International Trade Commission, for Defendant.

Manatt, Phelps & Phillips, LLP (Irwin P. Altschuler, Jeffrey S. Neeley, and Susan M. Schmidt), for Defendant-Intervenor.

**OPINION**

RIDGWAY, Judge:

In this action, Plaintiff Committee For Fairly Traded Venezuelan Cement ("Venezuelan

Cement") contests the five-year "sunset" review determination[1] of the United States International Trade Commission ("Commission") that termination of the suspended antidumping and countervailing duty investigations of gray portland cement and cement clinker[2] from Venezuela would not likely lead to the continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[3]

For the reasons set forth below, Plaintiff's motion for judgment upon the agency record is

---

[1]In a "sunset" review involving a suspended antidumping or countervailing duty investigation, the administering authority and the Commission are required to determine whether termination of the investigation would likely lead to continuation or recurrence of dumping or a countervailable subsidy and of material injury. 19 U.S.C. § 1675(c)(1)(A) (2000).

Unless otherwise indicated, all statutory provisions are made in reference to the 2000 version of the United States Code, the relevant provisions of which were in place (or substantively identical to provisions in place) during the relevant time period.

[2]Gray portland cement is currently classifiable under subheading 2523.29 of the Harmonized Tariff Schedule of the United States ("HTSUS"), and cement clinker is classifiable under subheading 2523.10, HTSUS. Gray portland cement has also been entered under subheading 2523.90, HTSUS as "other hydraulic cements." Cement consists of a gray powder that is the binding agent in concrete. Cement clinker is manufactured by heating a ground mix of materials such as limestone, clay, and iron ore at a high temperature in a kiln. Cement is composed of ground clinker and small amounts of other materials, such as gypsum. Cement is then mixed with water, sand, and other aggregates to make concrete. *See* Plaintiff's Brief in Support of Motion For Judgment on the Agency Record ("Pl.'s Brief") at 6 n.2.

[3]The contested determination in this action reviewed: (1) a suspended countervailing duty investigation of gray portland cement and cement clinker from Venezuela; (2) a suspended antidumping investigation of gray portland cement and cement clinker from Venezuela; (3) an antidumping order on gray portland cement and cement clinker from Mexico; and (4) an antidumping order on gray portland cement and cement clinker from Japan. Only the Commission's negative determination with respect to the suspended countervailing duty and antidumping investigations of gray portland cement and cement clinker from Venezuela is at issue in this action. Complaint ¶ 1. *See* Gray Portland Cement and Cement Clinker From Japan, Mexico, and Venezuela, 65 Fed. Reg. 65,327 (Nov. 1, 2000).

denied.

I. Background

On May 21, 1991, Venezuelan Cement filed a petition with the Commission and the International Trade Administration of the Department of Commerce ("Commerce"), alleging that an industry in the United States was materially injured or threatened with material injury by reason of gray portland cement and cement clinker imported from Venezuela at less than fair value. Complaint ¶ 7. After conducting preliminary investigations, the Commission determined that there was a reasonable indication that an industry in the United States was being materially injured by reason of imports from Venezuela. *See* Gray Portland Cement and Cement Clinker from Venezuela, 56 Fed. Reg. 32,589 (July 17, 1991) (import investigation); Gray Portland Cement and Cement Clinker from Venezuela, USITC Pub. 2400, Inv. Nos. 303-TA-21 and 731-TA-519 (July 1991) (prelim. determinations and investigation information). *See also* Complaint ¶ 7.

Commerce issued affirmative preliminary determinations in its antidumping and countervailing duty investigations of cement from Venezuela. *See* Gray Portland Cement and Clinker from Venezuela, 56 Fed. Reg. 56,390 (Dep't Commerce Nov. 4, 1991) (notice of preliminary determinations of sales at less than fair value) (finding dumping margins for certain Venezuelan exporters: 50.02 % for Cementos Caribe ("Caribe"), 49.20% for Venezolana de Cementos ("Vencemos"),[4] and 49.26% for "all others"); Gray Portland Cement and Clinker from Venezuela,

[4]Vencemos, now renamed CEMEX Venezuela, S.A.C.A., is the defendant-intervenor in the present action. *See* Transcript of Oral Argument ("Tr.") at 108 (counsel for Defendant-Intervenor stating that "Vencemos is still understood to be an operative name").

56 Fed. Reg. 41,522 (Dep't Commerce Aug. 21, 1991) (preliminary affirmative countervailing duty determination) (finding countervailable subsidies benefitting Caribe and Vencemos). *See also* Complaint ¶ 7.

Based on suspension agreements with Venezuela, Commerce suspended the antidumping and countervailing duty investigations of gray portland cement and cement clinker from Venezuela. *See* Gray Portland Cement and Clinker from Venezuela, 57 Fed. Reg. 6706 (Dep't Commerce Feb. 27, 1992) (suspension of antidumping investigation); Gray Portland Cement and Clinker from Venezuela, 57 Fed. Reg. 9242 (Dep't Commerce Mar. 17, 1992) (suspension of countervailing duty investigation). *See also* Complaint ¶ 9.[5]

Effective January 1, 1995, the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 § 220 (1994), added a requirement in section 751(c) of the Act, which obligates the Commission and Commerce to conduct five-year "sunset" reviews of countervailing duty orders, antidumping orders, and notices suspending investigations. *See* 19 U.S.C. § 1675(c)(1)(A) (2000).[6] The present action involves the Commission's determination whether termination of the notices suspending the antidumping and countervailing duty investigations "would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy . . . and of material injury." 19 U.S.C. § 1675(c)(1)(A) (2000). As stated by the Statement of Administrative Action to the Uruguay

---

[5] Although the Commission initiated final injury investigations, the investigations were never completed. *See* Gray Portland Cement and Clinker from Venezuela, 56 Fed. Reg. 63,523 (Dec. 4, 1991).

[6] The new requirement applies to "transition orders," i.e., orders and suspended investigations that were in effect on the effective date of the URAA. 19 U.S.C. § 1675(c)(6)(C)(iii) (2000).

Round Agreements Act of 1994 ("SAA"),[7] a document expressly approved by Congress in relation

to the URAA, "[t]he recurrence of material injury standard is prospective in nature." SAA, H.R.

Doc. No. 103-316 at 884 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4209. *See also* Pl.'s Brief

at 10.

On August 2, 1999, pursuant to 19 U.S.C. § 1675(c)(1)(A), Commerce and the Commission

published their respective notices initiating and instituting its "sunset" review of the suspended

antidumping and countervailing duty investigations of subject imports from Venezuela. Gray

Portland Cement and Clinker from Japan, Mexico, and Venezuela, 64 Fed. Reg. 41,915 (Dep't

Commerce Aug. 2, 1999) (initiation of five-year reviews); Gray Portland Cement and Clinker from

Japan, Mexico, and Venezuela, 64 Fed. Reg. 41,958 (Aug. 2, 1999) (institution of five-year reviews).

*See* Complaint ¶ 11.[8] The Commission published notice of its schedule of reviews and of a public

hearing to be held on August 15, 2000 in connection with the reviews. Gray Portland Cement and

Cement Clinker from Japan, Mexico, and Venezuela, 65 Fed. Reg. 17,901 (Apr. 5, 2000).[9] After

---

[7]The SAA "represents an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements." SAA at 656. The SAA notes the Administration's understanding that "it is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." *Id.*

[8]On November 17, 1999, the Commission gave notice that it would conduct full "sunset" reviews pursuant to section 751(c)(5) of the Tariff Act of 1930 "of antidumping duty orders on gray portland cement and cement clinker from Japan and Mexico and . . . the suspension agreement on gray portland cement and cement clinker from Venezuela." Gray Portland Cement and Cement Clinker from Japan, Mexico, and Venezuela, 64 Fed. Reg. 62,689 (Nov. 17, 1999). *See* 19 U.S.C. § 1675(c)(5) (2000).

[9]Before the public hearing, Commerce found that termination of the suspended antidumping investigation would likely lead to continuation or recurrence of dumping. *See* Gray Portland Cement

conducting a regional industry analysis pursuant to 19 U.S.C. § 1677(4)(C), the Commission published notice of its final negative determination that "termination of the suspended investigations on gray portland cement and cement clinker from Venezuela would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time." Gray Portland Cement and Cement Clinker from Japan, Mexico, and Venezuela, 65 Fed. Reg. 65,327 (Nov. 1, 2000). *See also* Commission Views. *See generally* Complaint ¶ 13.

In a regional industry analysis, the Commission may find "material injury, the threat of material injury, or material retardation of the establishment of an industry . . . even if the domestic industry as a whole . . . is not injured." 19 U.S.C. § 1677(4)(C) (2000). The Commission must satisfy three prerequisites[10] before reaching an affirmative determination in a regional industry

---

and Clinker from Venezuela, 65 Fed. Reg. 41,050 (Dep't Commerce July 3, 2000) (final results of sunset review of suspended antidumping investigation). *See also* Complaint ¶ 12. Commerce also found that termination of the countervailing duty investigation on imports from Venezuela would likely lead to continuation or recurrence of a countervailable subsidy on imports from Venezuela. *See* Gray Portland Cement and Clinker from Venezuela, 65 Fed. Reg. 11,554 (Dep't Commerce Mar. 3, 2000) (final results of sunset review of suspended countervailing duty investigation). *See also* Complaint ¶ 12. *See generally* C.D. 193, Gray Portland Cement and Cement Clinker from Japan, Mexico, and Venezuela, USITC Pub. 3361, Inv. No. 303-TA-21 and 731-TA-451, 461, and 519 (Oct. 2000) ("Commission Views") (final views of the Commission).

Because the administrative record in this action includes confidential information, two versions of that record were prepared. Citations to the public documents are noted as "P.D.," while citations to the confidential version are noted as "C.D."

[10]Namely,

[t]he Commission must determine that there is: (1) a regional market satisfying the requirements of the statute, (2) a concentration of dumped imports into the regional market, and (3) material injury or threat thereof to producers of all or almost all of the regional production, or material retardation to the establishment of an industry due to the subsidized or dumped imports.

analysis. Texas Crushed Stone Co. v. United States, 17 CIT 428, 432, 822 F. Supp. 773, 777 (1993) ("Texas Crushed Stone I"), *aff'd*, 35 F.3d 1535 (Fed. Cir. 1994) ("Texas Crushed Stone II").[11]

With respect to the first prerequisite, i.e., a regional industry satisfying the requirements of section 1677(4)(C), the Commission determined that "the record again supports finding three separate regional industries, which correspond, or are similar, to those defined in the original investigations." Commission Views at 17. *See generally* 19 U.S.C. § 1677(4)(C) (2000). As a result, the Commission found that "a regional industry exists for the State of Florida region." *Id.* at 23. *See also* Commission Views at 15-18, 22-23 (discussing and applying the requirements of section 1677(4)(C) for a regional industry).[12]

---

Texas Crushed Stone I, 17 CIT at 432, 822 F. Supp. at 777.

[11]Due to the "prospective" nature of a "sunset" review, the Commission is not obligated to determine whether subject import levels actually satisfy the import concentration standard during the period of review. The Commission need only determine the likelihood that subject import levels will meet the concentration standard within the reasonably foreseeable future if the suspended investigations are terminated. SAA at 888 ("Neither the Commission nor interested parties will be required to demonstrate that the regional industry criteria currently are satisfied."); Commission Views at 27 (same); Pl.'s Brief at 17 (same); Memorandum of Defendant U.S. International Trade Commission in Opposition to Plaintiff's Motion For Judgment on the Agency Record ("Def.'s Response Brief") at 41 (same). *See* 19 U.S.C. § 1675(c)(1)(A) (2000). *See also* 19 U.S.C. § 1675a(a)(8)(2000) ("In determining if a regional industry analysis is appropriate for the determination in review, the Commission shall consider whether the criteria established in section 1677(4)(C) of this title are *likely to be satisfied* if . . . the suspended investigation is terminated.") (emphasis added).

[12]"In determining if a regional industry analysis is appropriate for the determination in the review, the Commission shall consider whether the criteria established in [19 U.S.C. § 1677(4)(C)] are likely to be satisfied if . . . the suspended investigation is terminated." 19 U.S.C. § 1675a(a)(8) (2000). *See* SAA at 887 ("[T]he Commission is not bound by any determination it may have made in the original investigation regarding the existence of a regional industry"), 888 ("Given the predictive nature of a likelihood of injury analysis, the Commission's analysis in regional industry investigations will be subject to no greater degree of certainty than in a review involving a national

However, the Commission majority found that the record did not satisfy the second prerequisite, i.e., a concentration of dumped imports into the regional market. *See* 19 U.S.C. § 1677(4)(C) (2000) (requiring, *inter alia*, "a concentration of dumped imports or imports of merchandise benefiting from a countervailable subsidy into . . . an isolated market"). Instead, it found that "subject imports from Venezuela into the Florida region are not likely to account for a substantial proportion of total U.S. imports of cement from Venezuela in the reasonably foreseeable future if the suspended investigations are terminated." Commission Views at 30. *See also* Complaint ¶ 20. *See generally* Commission Views at 26-30.[13]

The Commission then concluded in its prospective analysis that "termination of the suspended . . . investigations would not be likely to lead continuation or recurrence of material injury to an industry in the United States, pursuant to [19 U.S.C. § 1675(d)(2)]" and ordered the termination of the suspended investigations on subject imports from Venezuela. Gray Portland Cement and Cement Clinker from Venezuela, 65 Fed. Reg. 68,974 (Dep't Commerce Nov. 15, 2000) (final determination). *See* Commission Views at 27-30; Complaint ¶ 14. *See generally* 19 U.S.C. § 1675(d)(2) (2000) (addressing termination of suspended investigations); SAA at 891-92 (same).

_____

industry.").

[13]Because the Commission majority did not find the requisite concentration of imports in the regional market, it could not proceed to an analysis of the third prerequisite under section 1677(4)(C), i.e., material injury or threat of material injury to production within the regional market, or material retardation to the establishment of an industry due to dumped or subsidized imports. 19 U.S.C. § 1677(4)(C) (2000). As a result, the Commission never conducted an "analysis of likely continuation or recurrence of material injury." Commission Views at 30. *See* Texas Crushed Stone I, 17 CIT at 432, 822 F. Supp. at 777 ("The Commission will move on to the next step only if each preceding step is satisfied."). *See also* Def.'s Response Brief at 21 n.44 (noting that "Plaintiff does not challenge the Commission's determination not to proceed to the third step").

While Commissioner Miller determined that there was sufficient evidence to satisfy the import concentration criteria,[14] she declined to cumulate the likely volume and effect of imports from Venezuela and Mexico into Florida if the suspended agreements were terminated. C.D. 193, Separate Views of Commissioner Marcia E. Miller (Oct. 27, 2000) ("Separate Views") at 78-79. *See* Complaint ¶¶ 27-28.

In its USCIT R. 56.2 motion for judgment upon the agency record, Venezuelan Cement contests the Commission's final negative determination. Specifically, Venezuelan Cement challenges: 1). the Commission majority's finding that subject imports in the Florida region are not likely to satisfy the concentration standard if the suspended antidumping and countervailing duty investigations are terminated; 2). the Commission's finding that subject imports in the Florida region are unlikely to increase in the reasonable future if the suspended investigations are terminated; and 3). Commissioner Miller's decision not to cumulate subject imports from Venezuela and Mexico. Complaint ¶¶ 21, 24, 28-29.

## II. Jurisdiction

This action is brought pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and 28 U.S.C. § 1581(c).

As a preliminary matter, the Government raises an issue of exhaustion. The Government claims that Venezuelan Cement is barred from arguing that "Congress changed, and in effect lowered, the standard for the import concentration criterion primarily considered by the Commission

---

[14]In particular, Commissioner Miller notes that "[w]hile the proportion of total U.S. imports of Venezuelan cement entering Florida has declined, Florida continues to be the primary U.S. market for Venezuelan cement as its U.S. shipments outside Florida are widely dispersed across a number of States, particularly along the east coast." Separate Views at 77.

in past practice" for the first time on appeal.  Def.'s Response Brief at 3, 31.  *See also* Tr. at 33, 38, 46-47.

Specifically, the Government objects to Venezuelan Cement's argument that "[t]he standard is now stated to be whether regional imports account for a 'substantial proportion' of national imports . . . plainly indicat[ing] that import concentration can be found where far less than 50 percent of imports enter the region."  Pl.'s Brief at 33.  *See also id.* ("This new standard supersedes the Commission's prior practice.").  According to the Government, Venezuelan Cement did not raise this argument at the agency level, there by failing to exhaust its administrative remedies. *See* Def.'s Response Brief at 3, 31-38.  *See generally* Plaintiff's Reply Brief in Support of Motion For Judgment on the Agency Record ("Pl.'s Reply Brief") at 22-29 (contesting Government's claim); Tr. at 90-93 (same).

Generally, courts have recognized that "a litigant may not raise an issue for the first time on appeal."  *See, e.g.,* Cemex S.A. v. United States, 16 CIT 251, 258, 790 F. Supp. 290, 296 (1992) (subseq. history omitted); Wieland Werke, A.G. v. United States, 13 CIT 561, 567, 718 F. Supp. 50, 55 (1989).  Indeed, "[t]he doctrine of exhaustion of administrative remedies generally requires that a party present a claim at the agency level prior to raising it before the court."  Usinor Industeel v. United States, No. 01-00006, 2002 Ct. Intl. Trade LEXIS 151, at *17 n. 12 (Dec. 20, 2002) (*citing* Pacific Giant, Inc. v. United States, 26 CIT __, 223 F. Supp. 2d 1336 (2002); Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998)).

However, it is within the Court's discretion to require the exhaustion of administrative remedies "where appropriate."  *See* 28 U.S.C. § 2637(d) (2000). *See, e.g.,* Budd Co., Wheel & Brake

Div. v. United States, 15 CIT 446, 452 n.2, 773 F. Supp. 1549, 1555 n.2 (1991) (listing "examples of cases where the Court has not required exhaustion of administrative remedies").

In the present case, it appears that Venezuelan Cement formulated its "substantial proportion" argument at the agency level based on Congress's own language regarding the standard for import concentration. SAA at 860. *See* Pl.'s Reply Brief at 22-29. Indeed, Venezuelan Cement interpreted the standard for import concentration as requiring "(1) the import penetration in the region [that] is 'clearly higher' than the import penetration outside the region and (2) subject imports in the region [that] are a 'substantial proportion' of total subject imports into the United States." Pl.'s Reply Brief, Exh. B (C.D. 127, Prehearing Brief on Behalf of the Domestic Industry, Inv. Nos. 303-TA-21 (Review) and 731-TA-451, 461, and 519 (Review)) at 29 (*quoting* SAA at 860). *See also* Pl.'s Reply Brief at 23-24.

Even the Government acknowledges that Venezuelan Cement contended at the agency level that "Florida imports accounted for a substantial share of national imports–averaging 54 percent of national imports during 1997-1999" and that the import concentration standard was satisfied. Def.'s Response Brief at 32-33 (*quoting* C.D. 127, Prehearing Brief at 32). *See* Pl.'s Reply Brief at 24-25. *See also* P.D. 170, Posthearing Brief on Behalf of the Domestic Industry, Inv. Nos. 303-TA-21 (Review) and 731-TA-451, 461, and 519 (Review) at 23 (arguing that "Florida . . . accounted for a 'substantial proportion of total subject imports entering the United States'–54 percent") (citations omitted).

However, the Government claims that Venezuelan Cement "never argued, as it does now, that the criterion had been substantially revised." Def.'s Response Brief at 32 (*citing* P.D. 154,

Hearing Transcript at 110-11).  But in its pre-hearing brief to the Commission, Venezuelan Cement

did present its claim that Congress *had since clarified* the standard for finding a concentration of

subject imports in the regional industry.   C.D. 127, Prehearing Brief at 28-29 (*citing* SAA at 860;

H. Rep. 103-826, Pt. 1, at 66 (1994); S. Rep. 103-412 at 53-54 (1994)) (emphasis added).  Even so,

> [w]hile a plaintiff cannot circumvent the requirements of the doctrine of exhaustion
> by merely mentioning a broad issue without raising a particular argument, [the]
> plaintiff's brief statement of the argument is sufficient if it alerts the agency to the
> argument with reasonable clarity and avails the agency with an opportunity to address
> it.

Timken Co. v. United States, 25 CIT __, __, 166 F. Supp. 2d 608, 628 (2001). *See generally* Hormel

v. Helvering, 312 U.S. 552, 557 (1941); Fabrique de Fer de Charleroi S.A. v. United States, 25 CIT

__, __, 155 F. Supp.2d 801, 806 (2001); Rhone Poulenc, S.A. v. United States, 7 CIT 133, 134-35,

583 F. Supp. 607, 609-10 (1984) (subseq. history omitted).

In any event, the Government has suffered no prejudice as a result of Venezuelan Cement's

alleged failure to make the specific assertion that Congress had revised its import concentration

criterion. *See, e.g.,* Saarstahl A.G. v. United States, 20 CIT 1413, 1420-21, 949 F. Supp. 863, 868-69

(noting the "exception to the exhaustion requirement set forth in Timken and Rhone Poulenc–that

exhaustion of administrative remedies is not required when plaintiff raises a new argument purely

legal in nature which requires no further agency involvement") (*citing* Timken Co. v. United States,

15 CIT 658, 659-60, 779 F. Supp. 1402, 1404-05 (1991); Rhone Poulenc, S.A., 7 CIT at 137-38, 583

F. Supp. at 611-12), *aff'd*, 177 F.3d 1314 (Fed. Cir. 1999)).[15]

---

[15]Instead, Venezuelan Cement alerted the Commission to its view that import concentration
exists in a regional industry under section 1677(4)(C) if there is a "substantial proportion" of subject
imports in a regional industry.  SAA at 860.  While Venezuelan Cement may not have specifically

The agency's interpretation of the import concentration standard under section 1677(4)(C) is clearly at the heart of the dispute presented here. *See, e.g.,* Complaint ¶¶ 17-18, 21-22, 24-25. The Government expresses its concern that Venezuelan Cement's argument "would have this Court rewrite both Commission practice and legislative history to serve [its] interests." Def.'s Response Brief at 33. But Venezuelan Cement's claim that the "new standard supersedes the Commission's prior practice" is part and parcel of its interpretation of the import concentration standard, as expressed in the SAA and legislative history of section 1677(4)(C). Pl.'s Brief at 33. *See also* Def.'s Response Brief at 33. If Venezuelan Cement's overarching arguments with respect to the import concentration standard fail, its claim that Congress "revised" the standard necessarily fails as well. *See, e.g.,* Rhone Poulenc, S.A., 7 CIT at 136, 583 F. Supp. at 610-11 ("It appears to the court that had plaintiffs raised the alternative argument different results would not have materialized in the administrative proceedings. There is no reason to believe that [this alternative argument] would have served any useful function in this case.").

Accordingly, exhaustion of administrative remedies is neither necessary nor appropriate here.

## III.  Standard of Review

An agency determination may be overturned if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000). "[S]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a

---

expressed its argument as a "revision" of the import concentration standard, it is clear that its interpretation is based on the SAA and legislative history treatment of the import concentration standard.  *See generally* Pl.'s Reply Brief at 22-29.

reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (*quoting* Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Even if two inconsistent conclusions may be drawn from the evidence, the agency interpretation may be supported by substantial evidence. Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

Furthermore, "[t]he Commission's decision does not depend on the 'weight' of the evidence, but rather on the expert judgment of the Commission based on the evidence of record." Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984). Therefore, "[t]he court cannot substitute its judgment for that of the agency, nor may it reweigh the evidence." Acciai Speciali Terni, S.p.A. v. United States, 19 CIT 1051, 1054 (1995). Instead, the Commission's determination will be sustained when it is reasonable and supported by the record as a whole, even where there is evidence which detracts from the substantiality of the evidence." Mitsubishi Materials Corp. v. United States, 17 CIT 301, 304, 820 F. Supp. 608, 613 (1993) (subseq. history omitted) (*citing* Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556 (Fed. Cir. 1984)). Finally, "if the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984) (citation omitted). *See also, e.g.,* Suramerica de Aleaciones, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992) (stating that courts have a duty to "respect legitimate policy choices made by the agency in interpreting and applying the statute").

## IV. Analysis

As noted above, in conducting a "sunset" review, the Commission must determine whether

the termination of the suspended antidumping and countervailing duty investigations would be likely to: 1). "lead to continuation or recurrence of dumping or a countervailable subsidy"; and 2). material injury.[16] For the purposes of a "sunset" review, the Commission may make a finding of material injury if it concludes from a regional industry analysis that subject imports from Venezuela are sufficiently concentrated in a regional industry, thereby resulting in material injury (or the threat thereof) in that regional market. 19 U.S.C. § 1677(4)(C) (2000).

A.      Commission's Regional Industry Analysis

The regional industry statute was added to the antidumping and countervailing duty statute as part of the Trade Agreements of 1979 ("1979 Act"), Pub. L. No. 96-39, Title I, § 771(4)(C), 93 Stat. 144, 177. *See* H.R. Rep. No. 96-317, at 73 (1979); S. Rep. No. 96-249, at 61, *reprinted in* 1979 U.S.C.C.A.N. 381, 468-89. *See generally* 19 U.S.C. § 1677(4)(C) (2000).[17] Once the Commission

---

[16]The relevant statute provides:

5 years after the date of publication of–
> (A)      . . . a notice of suspension of an investigation [pursuant to 19 U.S.C. § 1675(a)(1)],

> the administering authority and the Commission shall conduct a review to determine, in accordance with [19 U.S.C. § 1675a], whether . . . termination of the investigation suspended under [19 U.S.C. § 1671c or § 1673c] would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy (as the case may be) and of material injury.

19 U.S.C. § 1675(c)(1)(A) (2000).

[17]Prior to the Trade Agreements of 1979, the Commission considered regional markets in certain determinations. Def.'s Reply Brief at 18 (*citing* Portland Hydraulic Cement from Canada, Inv. No. AA1921-184, USITC Pub. 918 at 4-5, 13-14, 17-18 (Sept. 1978); S. Rep. No. 93-1298, at 180-81 (1974)). *See also* Pl.'s Brief at 23 n. 11 (*citing* Portland Cement from Sweden, Inv. No.

finds a regional market satisfying the requirements of section 1677(4)(C),

> material injury, the threat of material injury, or material retardation of the establishment of an industry may be found to exist with respect to an industry even if the domestic industry as a whole, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of that product, is not injured, if there is a concentration of dumped imports or imports of merchandise benefiting from a countervailable subsidy into such an isolated market . . . .

19 U.S.C. § 1677(4)(C) (2000).  By allowing the Commission to make a material injury finding in a regional industry, given certain circumstances, section 1677(4)(C) is "designed to relieve a domestic industry's burden of demonstrating injury on a nationwide basis."  Gifford-Hill Cement Co. v. United States, 9 CIT 357, 363, 615 F. Supp. 577, 582 (1985) (citations omitted). *See also* Tr. at 72 (counsel for Vencemos noting that the requirement of a concentration of imports "is quite reasonable, since imports nationwide will be affected by a finding of injury to a small portion of the country").

The plain language of the statute does not define "a concentration of dumped or subsidized imports" under section 1677(4)(C).  In the absence of the "unambiguously expressed intent of Congress," the Commission's reasonable statutory interpretation is entitled to deference.  Chevron, 467 U.S. at 843. *See, e.g.,* United States v. Mead Corp., 533 U.S. 218, 229 (2001) ("Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which 'Congress did not actually have an intent' as to a particular result. [In such cases], a reviewing court has no business rejecting an agency's

---

AA1921-16, TC Pub. 10 (1961); Portland Cement from Belgium, Inv. No. AA1921-19, TC Pub. 22 (1961); Portland Gray Cement from Portugal, Inv. No. AA1921-22, TC Pub. 37 (1961); Portland Cement from the Dominican Republic, Inv. No. AA1921-25, TC Pub. 87 (1961)).

exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen regulation seems unwise, but is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable.") (*quoting* Chevron, 467 U.S. at 845-846). *See generally* Def.'s Response Brief at 21-22.

In considering the reasonableness of the Commission's statutory interpretation, a court may employ all "traditional tools of statutory construction," including "the statute's structure, canons of statutory construction, and legislative history." Chevron, 467 U.S. at 842; Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998). *See also* Def.'s Response Brief at 22; Pl.'s Reply Brief at 2-3.

1.      Import Concentration Standard under the URAA

Generally, Venezuelan Cement contests the Commission's application of the import concentration standard in its regional industry analysis under the URAA.[18]

The enactment of the URAA did not change the regional industry statute itself, but the SAA

---

[18]The Commission's reviewing courts have addressed the import concentration standard under the 1979 Act in Texas Crushed Stone I, 17 CIT 428, 822 F. Supp. 773, and Texas Crushed Stone II, 35 F.3d 1535. However, it appears that the import concentration standard under the URAA (much less, in a "sunset" review) is an issue of first impression. *See, e.g.,* Tr. at 5 (counsel for Venezuelan Cement noting that ("This is a case of first impression, because the Court has never previously considered the current import concentration test, or considered import concentration in the context of a Sunset Review."), 97 (same); *id.* at 49-50 (counsel for the Commission noting that at the agency level, "[t]here are three . . . regional industry cases that have occurred under the [URAA], and in each of them, the Commission has followed this same practice [of applying its "percent of imports" test] that it has followed before, with the exception that it now applies two tests . . . to every case.").

and the legislative history of the URAA established a new two-part import concentration standard. *See* SAA at 860; S. Rep. No. 103-412, at 53 (1994); H.R. Rep. No. 103-826(I), at 66 (1994). *See also* Pl.'s Brief at 32-33; Def.'s Response Brief at 29-30; Defendant-Intervenor Brief in Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Def.-Intervenor's Brief") at 19-20. The first part of the standard ("clearly higher" criterion) requires the Commission to determine whether "the ratio of the subject imports to consumption is clearly higher in the regional market than in the rest of the U.S. market." SAA at 860. *See also* S. Rep. No. 103-412, at 53 (1994); H.R. Rep. No. 103-826(I), at 66 (1994).[19] The Commission concluded that the "clearly higher" criterion was satisfied, noting that "[d]uring the period of review, import penetration was higher within the Florida region than outside the region." Commission Views at 26. *See also id.* at 26 n.87, 30.[20] The

---

[19]In the Trade Agreements Act of 1979, the "clearly higher" standard was the sole criterion needed to find the requisite concentration of imports in a regional industry analysis. *See, e.g.,* S. Rep. No. 96-249, at 83 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 469 ("The requisite concentration will be found to exist in at least those cases where the ratio of the subsidized, or less-than-fair value, imports to consumption of the imports and domestically produced like imports to consumption of the imports and domestically produced like imports is clearly higher in the relevant regional market than in the rest of the U.S. market.").

There is no indication that the "clearly higher" criterion enacted under the URAA differs from its incarnation in the 1979 Act. *Compare, e.g.,* S. Rep. No. 96-249, at 61, *reprinted in* 1979 U.S.C.C.A.N. 381, 468-89 (finding requisite concentration where the ratio of imports in a regional industry is clearly higher than imports in the rest of the U.S. market) *with* SAA at 860 (same). *See* Pl.'s Brief at 33 (stating that the "clearly higher" test in the URAA "is the same as the test announced in the Statements of Administrative Action and legislative history of the 1979 Act"); Pl.'s Reply Brief at 4 (same).

[20]The Commission found that

[t]he ratio of subject imports from Venezuela to consumption within the Florida region was 12.0 percent in 1997 and 10.0 percent in 1998 and 1999. In contrast, the ratio of subject imports from Venezuela to consumption outside the Florida region

Commission's affirmative finding with respect to the "clearly higher" criterion is not challenged

here. *See, e.g.,* Def.'s Response Brief at 20-21; Tr. at 7.

The SAA and the legislative history of the URAA established the second part of the import

concentration standard in a regional industry analysis, i.e., that the subject imports in the regional

industry "account for a substantial proportion of total subject imports entering the United States"

("substantial proportion" criterion). SAA at 860. *See also* S. Rep. No. 103-412 (1994); H.R. Rep.

No. 103-826(I) (1994). Venezuelan Cement challenges the Commission's determination that the

"substantial proportion" criterion was not satisfied by the record. *See, e.g.,* Pl.'s Brief at 23-55; Pl.'s

Reply Brief at 3-45.

    2.    Commission's "Percent of Imports" Test

Prior to the adoption of the "substantial proportion" criterion, the Federal Circuit upheld the

Commission's use of the "percent of imports" test[21] as a reasonable interpretation of the regional

_____

was less than 0.5 percent in 1997 and 1.0 percent in 1998 and 1999.

Commission Views at 26 n.87 (citation omitted).

[21]In its "percent of imports" test, the Commission "considers the percentage of all subject imports that are imported into the region; if the region accounts for a sufficiently large percentage of all the subject imports in light of the facts of the case, the Commission will find that the imports are concentrated." Texas Crushed Stone I, 17 CIT at 433, 822 F. Supp. at 777. *See also* Def.'s Response Brief at 23-4 (same).

Venezuelan Cement characterizes the Commission's "percent of imports" test as requiring "the imports into the region to constitute at least 80 percent of total national imports." Pl.'s Reply Brief at 5 (*citing* Pl.'s Brief at 26-27; Def.'s Response Brief at 23-24). But it appears that while "the Commission historically has found sufficient concentration where the percentage of imports in the region is 80 percent or higher of total imports subject to investigation," the Commission has found sufficient concentration with levels falling between 61.2 and 73.7 percent. Def.'s Response Brief

industry statute.  Texas Crushed Stone II, 35 F.3d at 1541-42.[22]  The Federal Circuit found that because "Congress has not 'unambiguously' expressed an intent on the question of what test is to be used in determining whether there has been a concentration of dumped imports in a particular region," the Commission could use its "percent of imports" test unless that interpretation was found to be unreasonable.  *Id.* at 1541.[23]  The court then determined that the Commission "acted reasonably and did not abuse its discretion in applying the percent of imports test [that] case."  *Id.* at 1542.

Venezuelan Cement states that when the Commission's use of the "percent of imports" test was found reasonable and not inconsistent with its prior practice, the Federal Circuit created "law

---

at 24, 24 n.53 (citations omitted).  *See also id.* at 25 (noting that the Commission has also found sufficient concentration at a level as low as 43 percent).

[22]In Texas Crushed Stone, the Commission issued a determination based on a finding that there was no import concentration where imports in the region were less than 60 percent of the total U.S. imports over the period of investigation.  Texas Crushed Stone II, 35 F.3d at 1540-41.

[23]The Federal Circuit reasoned that because the statute itself offered no guidance, and the legislative history used both mandatory and permissive language with respect to the "clearly higher" criterion, the Commission was not obligated to apply the criterion to find import concentration in a regional industry analysis.  Texas Crushed Stone II, 35 F.3d at 1541.  *Compare* S. Rep. No. 96-259, at 83, *reprinted in* 1979 U.S.C.C.A.N. 381, 469 ("The requisite concentration *will be* found to exist in at least those cases where the ratio of the subsidized, or less-than-fair-value, imports to consumption of the imports and domestically produced like product is clearly higher in the relevant regional market than in the rest of the U.S. market.") (emphasis added) *with* H.R. Rep. No. 96-317, at 73 (1979) (stating that "concentration *could be* found to exist if the ratio of such imports to consumption is clearly higher in the regional market than in the rest of the U.S. market") (emphasis added) *and* Statement of Administrative Action, H.R. Doc. No. 153, Part II, 96th Cong., 1st Sess. 388, 432 (1979) ("Concentration of subsidized or dumped imports *could be* found to exist if there is a clearly higher ratio of such imports to consumption in such market than the ratio of such imports to consumption in the remainder of the United States market.") (emphasis added).  *See also* Pl.'s Brief at 30.  Therefore, based on the evidence of Congressional intent, the "clearly higher" criterion was envisioned by Congress, but not mandated.  Texas Crushed Stone I, 17 CIT at 433-34, 822 F. Supp. at 777-78.

prior to the URAA . . . that the Commission was not required to use the 'clearly higher' standard of import concentration, even though it was the only standard announced in the Statements of Administrative Action and legislative history of the 1979 Act."  Pl.'s Brief at 31.  *See also* Pl.'s Reply Brief at 7-8 (stating that "by 1994[,] the Commission no longer used the "clearly higher" test for import concentration").[24]

However, contrary to Venezuelan Cement's view, the Commission's reviewing courts have acknowledged the Commission's discretion to apply either its "percent of imports" test or the "clearly higher" criterion, "or both as seems appropriate to it based on the circumstances of each particular case."  Texas Crushed Stone I, 17 CIT at 435-36, 822 F. Supp. at 779 (*citing* Mitsubishi Materials Corp., 17 CIT at 306-07, 820 F. Supp. at 615-16).  *See also* Texas Crushed Stone II, 35 F.3d at 1541, 1542 (holding that the Commission's use of its "percent of imports" test is reasonable and not an abuse of discretion); Def.'s Response Brief at 22 (noting that it is within the Commission's discretion to determine "what constitutes sufficient concentration for the statutory requirement to be satisfied," and that "Congress did not change Commission practice regarding [its "percent of imports" test] in 1994, but rather affirmed the Commission's analysis in Mitsubishi

---

[24]Venezuelan Cement states that the Commission's "percent of imports" test has no basis in the regional industry statute or its legislative history.  *See* Pl.'s Brief at 30, 31; Pl.'s Reply Brief at 4-5.  *See also* Pl.'s Brief at 26 (claiming that the Commission "strayed from the 'clearly higher' standard established in the 1979 Statements of Administrative Action and legislative history . . . [to] devise[ ] a different import concentration standard that had no basis in the statute or legislative history").

However, as acknowledged by Venezuelan Cement, the Federal Circuit has found that the Commission's "percent of imports" test is a reasonable interpretation of Congressional intent.  Pl.'s Brief at 30-31.  *See* Texas Crushed Stone II, 35 F.3d 1535 (Fed. Cir. 1994), *aff'g* Texas Crushed Stone I, 17 CIT 428, 822 F. Supp. 773 (1993).

Materials and left to the Commission the discretion to determine what constitutes a substantial

percentage of imports on a case-by-case basis") (*citing* SAA at 860). *See generally* Def.'s Response

Brief at 28 (explaining that the Commission historically gave secondary consideration to the "clearly

higher" test under certain circumstances prior to the enactment of the URAA).[25]

Next, Venezuelan Cement claims that the import concentration standard in a regional

industry analysis was substantially revised by the SAA and the legislative history that accompanied

the URAA. *See* Pl.'s Brief at 32-33; Pl.'s Reply Brief at 3.[26] The standard in the URAA, it argues,

effectively replaced the "percent of imports" test with the "substantial proportion" test. Pl.'s Brief

at 33. *See* Def.'s Response Brief at 3, 31-38.[27]

---

[25]For example, after considering concentration under its "percent of imports" test, the Commission would consider "this alternate way of measuring concentration . . . when the imports outside the region were widely dispersed throughout the rest of the country or when the regional industry accounted for a significant portion of the total national industry." Def.'s Response Brief at 27.

[26]As the Government notes, Venezuelan Cement's claim that the "revised" import concentration standard "supersedes the Commission's prior practice" falters in light of its reliance on the benchmark concentration level in a pre-URAA case. Def.'s Response Brief at 33. *See also* Pl.'s Brief at 28-29 (discussing Certain Steel Wire Nails from the Republic of Korea, USITC Pub. 1088, Inv. No. 731-TA-26 (Aug. 1980)); SAA at 860.

[27]In contrast, the Government avers that Congress signaled its approval of its "percent of import" test by adopting it in the form of the "substantial proportion" criterion of the import concentration standard. Def.'s Response Brief at 28. *See also* Tr. at 37-38 (counsel for the Commission stating that "the Commission's position is that 'pecentage' and 'proportion' do not have a different meaning to them," and that Venezuelan Cement has "more of an issue with the word 'substantial' than [it does] with whether 'proportion' or 'percentage' are . . . the same term. So, our position would be that those terms are interchangeable"). *See also* Tr. at 39, 44, 50 (counsel for Defendant reiterating Commission's understanding that "substantial proportion" means "sufficiently large percentage").

In support of its claim, the Government notes that the SAA and the legislative history of the

There is nothing in the SAA or the legislative history of the URAA to support this claim. In contrast to the use of both mandatory and permissive language in the SAA and the legislative history of the 1979 Act, the SAA and the legislative history of the URAA provide a uniform mandate for finding import concentration if the "clearly higher" and "substantial proportion" criteria are both satisfied. *See, e.g.,* SAA at 860 ("Concentration *will be* found to exist if the ratio of the subject imports to consumption is clearly higher in the regional market than in the rest of the U.S. market and if such imports into the region account for a substantial proportion of total subject imports entering the United States.") (emphasis added); S. Rep. No. 103-412, at 53 (same); H.R. Rep. No. 103-826(I) (same). There is no mention of the Commission's "percent of imports" test, nor is there any evidence that Congress expressed the "substantial proportion" criterion to the exclusion of any test other than those a "precise mathematical formula" or a "'benchmark' proportion of imports." SAA at 860. *See also* S. Rep. No. 103-412, at 53-54; H.R. Rep. 103-826(I), at 66.

---

URAA include a citation to <u>Mitsubishi Materials,</u> a case which affirmed the Commission's use of the "percent of imports" test. *See* SAA at 860 (*citing* <u>Mitsubishi Materials,</u> 17 CIT at 306, 820 F. Supp. at 614-15); S. Rep. No. 103-412, at 53-54 (same); H.R. Rep. 103-826(I), at 66 (same). *See generally* Def.'s Response Brief at 28-29. However, Congress cited <u>Mitsubishi Materials</u> for the concept that "there is no 'benchmark' proportion of imports . . . which is applicable in every case, and below which the Commission cannot determine that imports are concentrated." *See, e.g.,* SAA at 860 (citation omitted). This concept is an entirely different proposition than the Government's claim that Congress intended to implement the Commission's "percent of import" test by adding the "substantial proportion" criterion to the import concentration standard.

Finally, it is not immediately clear that the "percent of imports" test and "substantial proportion" criterion are one and the same. While the "percent of imports" test finds concentration if there is a "sufficiently large percentage" of subject imports in a regional industry, the "substantial proportion" criterion provides that–assuming the "clearly higher" criterion is satisfied–concentration exists if subject imports in a regional industry "account for a substantial proportion of total subject imports entering the United States." SAA at 860. *See also* <u>Texas Crushed Stone I</u>, 17 CIT at 433, 822 F. Supp. at 777 (describing the Commission's "percent of imports" test).

In fact, although the Commission has continued to apply the "percent of imports" test since 1979, and Congress has since amended the antidumping and countervailing statute a number of times, the import requirement concentration remains unaltered. Texas Crushed Stone I, 17 CIT at 434, 822 F. Supp. at 778. *See* Def.'s Response Brief at 22 ("The Commission's consistent practice for considering import concentration has been to use the 'percent of imports' analysis in all regional industry cases.") (citation omitted), 28 (same). *See also id.* at 27-28 (noting that prior to the enactment of the URAA, the Commission's reviewing courts approved its practice of using the "percent of imports" test in all regional industry cases) (*citing* Texas Crushed Stone II, 35 F.3d at 1541; Mitsubishi Materials, 17 CIT at 306-309, 820 F. Supp. at 615-16). *See generally* 19 U.S.C. § 1677(4)(C) (2000).

Finally, Venezuelan Cement claims that the "clearly higher" criterion enacted under the URAA "is intended to alter the Commission's prior practice by requiring it in every case to consider the [criterion] originally set forth in the 1979 legislative history." Pl.'s Reply Brief at 8. *See also* Pl.'s Brief at 33 ("Congress and the Administration clearly would not have chosen to provide a new test for import concentration in 1994 if they had been satisfied with the Commission's prior practice in applying the import concentration requirement."). There is no indication in the SAA or legislative history of the URAA to suggest that Congress intended to "alter the Commission's prior practice" of applying its "percent of imports" test by merely repeating the 1979 "clearly higher" criterion in the 1994 version of the import concentration standard. *See, e.g.,* SAA at 860; S. Rep. No. 103-412 (1994); H.R. Rep. No. 103-826(I) (1994). *Cf., e.g.,* NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75 (1974) ("In addition to the importance of legislative history, a court may accord great weight

to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has re-enacted the statute without pertinent change.").

       3.      "Substantial Proportion" Criterion of the Import Concentration Standard

Venezuelan Cement's claims related to the import concentration standard enacted under the 1979 Act not withstanding, it is the present antidumping and countervailing duty statute, "as amended by the URAA and interpreted by its accompanying legislative history," that governs the regional industry analysis in this action. Def.-Intervenor's Brief at 17-18. The SAA and the legislative history thus URAA to gauge the reasonableness of the Commission's determination that the record does not satisfy the "substantial proportion" criterion of the import concentration standard. *See* Chevron, 467 U.S. at 842-43 (directing a court reviewing an agency's construction of a statute to first determine Congressional intent, then consider whether the agency's construction is permissible); Timex V.I., Inc., 157 F.3d at 882 (employing "tools of statutory construction" in order to determine Congressional intent) (citation omitted). *See also* Pl.'s Reply Brief at 2-3; Tr. at 8 (same).

As in the SAA and the legislative history of the 1979 Act, Congress declined to "unambiguously" express an intent on the question of what test is to be used in satisfying the two-part import concentration standard in the SAA and legislative history of the URAA. *See* Texas Crushed Stone II, 35 F.3d at 1541.[28] In fact, Congress expressly noted that neither a "precise

---

    [28]The language of the statute itself offers no guidance on the method to be used by the Commission in applying the import concentration standard in a regional industry analysis. *See* 19 U.S.C. § 1677(4)(C) (2000). *See, e.g.,* Texas Crushed Stone I, 17 CIT at 434, 822 F. Supp. at 778 ("[T]he statute is silent with respect to mandatory methods of analysis, leaving the Court to conclude

mathematical formula" nor a "'benchmark' proportion" could be specified for in an import concentration inquiry. SAA at 860 (citations omitted). *See also* S. Rep. No. 103-412, at 53-54; H. Rep. No. 103-826(I), at 66. Congress therefore reserved for the Commission the discretion to determine import concentration on a "case-by-case basis." SAA at 860. *See* Texas Crushed Stone I, 17 CIT at 437, 822 F. Supp. at 780 ("The Commission needs discretion in this area [of import concentration] to effectively carry out the requirements of 19 U.S.C. § 1677(4)(C), and Congress intended for the [Commission] to have such discretion.").

> a.      Minimum Benchmark Proportion of 43 Percent

Venezuelan Cement claims that because the Commission is now required to consider whether regional imports account for a "substantial proportion" of national imports, "import concentration can be found where far less than 50 percent of imports enter the region." Pl.'s Brief at 33. *See also* Pl.'s Brief at 36, 38. Because subject imports in the Florida region "accounted for an average of 54 percent of imports from Venezuela (64 percent in 1997, 53 percent in 1998, and 45 percent in 1999)," Venezuelan Cement claims that the record supports a finding of import concentration under the plain meaning of "substantial proportion." Pl.'s Reply Brief at 21-22 (citation omitted). *See also* Tr. at 8-10 (same).

In particular, Venezuelan Cement relies on Certain Steel Wire Nails from the Republic of Korea for the proposition that "a concentration of imports could exist where less than 50 percent of national imports of the subject merchandise entered the region." Pl.'s Brief at 35. *See also id.* at 36

---

that Congress intended for the Commission to exercise its discretion in this fact specific area of analysis.").

(stating that "[t]he SAA and legislative history surely would not have cited Steel Wire Nails if the Administration and Congress disagreed with the Commission's reasoning or the outcome in that case"); Tr. at 10 (same). *See generally* Certain Steel Wire Nails from the Republic of Korea, Inv. No. 731-TA-26 (Final), USITC Pub. 1088 (Aug. 1980) at 11 (finding import concentration at a level of 43 percent) (*cited in* SAA at 860; S. Rep. 103-412, at 54; H.R. Rep. 103-826(I), at 66).

Therefore, Venezuelan Cement concludes, the term "substantial" may contemplate a portion less than the majority of a whole. *See* Pl.'s Brief at 33 ("None of the dictionary definitions of the word 'substantial' requires, or even implies, that something must constitute a majority in order to be substantial") (*citing* Webster's Encyclopedic Unabridged Dictionary of the English Language (1994) definition "of ample or considerable amount, quantity, size, etc."); Pl.'s Reply Brief at 9 (same); Tr. at 8 (same). *See also* Tr. at 98 (counsel for Venezuelan Cement states that "where the language of a statute, or, in this case, legislative history, has a plain and ordinary meaning, there is a reason for it to be bolstered in some way by something somewhere else in the statute. That ordinary meaning would prevail in the ordinary instance").

However, it is worth considering the context in which Congress used the term "substantial." *See* Pl.'s Brief at 33-34, 34 n.18 (citing a litany of cases of varying relevance involving the term "substantial"). In this "sunset" review, the Commission determined that the subject imports in a regional industry were not sufficiently concentrated to merit a material injury analysis of a regional industry. *See* 19 U.S.C. § 1677(4)(C) (2000). *See also* Def.'s Response Brief at 30-31. As the Government notes, the definition of the term "substantial" that Venezuelan Cement advocates is not supported by "the statute or legislative history . . . in the context of import concentration." Def.'s

Response Brief at 34.  *Accord* Tr. at 44.[29]

Rather, it is clear that "there is no 'benchmark' proportion of imports that enter the region relative to imports that enter the United States, either 80 percent or any other percentage, which is applicable in every case, and below which the Commission cannot determine that imports are concentrated."  SAA at 860 (citation omitted).  In fact, "[w]hile the Commission found shipments

---

[29]While Venezuelan Cement acknowledges that it doesn't "support [its] discussion of the plain meaning of the term "substantial" with any reference to anything else than the legislative history or the antidumping and countervailing duty statutes to support that meaning," it maintains that "the ordinary meaning of this term is fully supplied by the dictionary and by court decisions . . . .").  Tr. at 98.  *See* Pl.'s Brief at 33 (offering dictionary definition of term "substantial"); Pl.'s Reply Brief at 9 (same); Tr. at 8 (same).

"To ascertain whether Congress had an intention on the precise question at issue, we employ the 'traditional tools of statutory construction.'  The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning."  Timex V.I., Inc., 157 F.3d at 882 (*citing* Chevron, 467 U.S. at 843 n.9; VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1579 (Fed. Cir. 1990)).  As the Supreme Court said in Chevron, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."  Chevron, 467 U.S. at 843 n.9.  Among the "tools of statutory construction" is the statute's legislative history.  Timex V.I., Inc., 157 F.3d at 882 (*citing* Chevron, 467 U.S. at 859-63; Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465 (1997); Oshkosh Truck Corp. v. United States, 123 F.3d 1477, 1481 (Fed. Cir. 1997)).

In the present case, Venezuelan Cement proffers the plain meaning of a term found in a statute's legislative history, not the statutory text itself.  *See, e.g.,* Tr. at 37 (counsel for the Commission observing that Venezuelan Cement "would have the Court apply rules of statutory construction to legislative history"), 45 ("Plaintiff would have this Court take away the Commission's discretion and define 'substantial.'").  Indeed, the term "substantial" does not appear in the regional industry statute in the context of the import concentration standard.  *See* 19 U.S.C. § 1677(4)(C) (2000).  *See also, e.g.,* SAA at 860 ("substantial proportion" criterion expressed, but not defined).  Therefore, there is no reason to suppose that the plain meaning of a term found in legislative history (a definition offered devoid of context) has overriding authority over the statute and the interpretive aid of the legislative history itself.  *See* Timex V.I., Inc., 157 F.3d at 882 ("This is not to suggest that these other tools [of statutory construction] can override a statute's unambiguous text.") (*citing* VE Holding Corp., 917 F.2d at 1579).

of 43 percent to be a concentration of the imports at issue in Steel Wire Nails . . ., it made it clear that this figure was not a benchmark to be followed in every case. *Congress wanted to provide flexibility, not a 43 percent benchmark.*" Texas Crushed Stone I, 17 CIT at 436-37, 822 F. Supp. at 780 (emphasis added). *See also* Texas Crushed Stone II, 35 F.3d at 1542 (citing different decisions, including Steel Wire Nails, in order to observe that the Commission's "record in this area [of the import concentration standard] is one of an individualized case-by-case method of analysis"). *See generally* Tr. at 44.

Thus, there is an incongruity between the congressional intent derived from the proper application of the relevant tools of statutory construction when properly applied, and Venezuelan Cement's claim that a level of 43 percent (or any other percentage less than the majority) mandates a finding of import concentration. It is well settled that "[import] concentration should be assessed on a case-by-case basis . . . because cases before the Commission are likely to involve different factual circumstances." SAA at 860 (citation omitted).

Finally, Congress cited to Steel Wire Nails for the proposition that "[no] precise mathematical formula [is] reliable in determining the minimum percentage which constitutes sufficient concentration because cases before the Commission are likely to involve different factual circumstances." SAA at 860 (citation omitted). However, such a citation – alone falls short of a wholesale Congressional approval for the concept that import concentration can exist at a level of less than 50 percent. *See* Def.'s Response Brief at 34-35; Tr. at 40-42, 45-46, 75-76.[30]

---

[30]While there is nothing in the SAA and legislative history of the URAA that expressly precludes the existence of import concentration at levels less than 50 percent, neither is there a Congressional mandate for finding sufficient concentration at such levels. *See* Tr. at 8-9 (counsel

b.        Minimum Benchmark Proportion of 60 Percent

Counsel for Venezuelan Cement alluded in turn to the notion that the Commission reached

its determination by operating under a "sixty percent test." Tr. at 10-13. *See also* Tr. at 24, 25

(counsel for Venezuelan Cement refers to the Commission's "sixty percent floor" or "sixty percent

practice"). *But see* Tr. at 33 (counsel for the Commission stating that "[t]he Commission has looked

at the facts of the case and has never had a sixty percent benchmark, as Plaintiff has alleged"), 34

(same); *id.* at 42, 45 (generally refuting suggestion that the Commission has relied on benchmark).

While courts have generally found sufficient import concentration where imports entering

a regional industry are at least eighty percent of total imports, proper treatment of imports less than

eighty percent of total imports is less clear. *See, e.g.,* Mitsubishi Materials Corp., 17 CIT at 306, 820

F. Supp. at 615 ("[T]he Commission has . . . previously found that percentages substantially less than

eighty percent to be sufficient concentrations to warrant a regional analysis."). The Government

admits that "[s]ince the Steel Wire Nails case in 1980, the Commission has not found concentration

to be sufficient in any case where the percentage of imports during the period of investigation was

lower than 60 percent." Def.'s Response Brief at 33 n.75 (citations omitted). *See also* Tr. at 10-11.

Indeed, as the Commission acknowledged in this case, Congress has instructed it to avoid

---

for Venezuelan Cement stating that federal courts have found percentages ranging from nine to forty percent to be "substantial"; "[o]ur research turned up no cases that found a percentage within [a] range [between nine and forty percent] to be insubstantial, much less any case finding a percentage over forty percent to be insubstantial"), 98 (same). *But see* Def.'s Response Brief at 33 n.75 (noting that "[s]ince the Steel Wire Nails case in 1980, the Commission has not found concentration to be sufficient in any case where the percentage of imports during the period of investigation was lower than 60 percent") (citations omitted). *See also* Tr. at 10-11.

methods of analysis employing a "benchmark" proportion. *See* SAA at 860 ("[N]o 'precise mathematical formula [is] reliable in determining the minimum percentage which constitutes sufficient concentration because cases before the Commission are likely to involve different factual circumstances.'") (citations omitted); Commission Views at 23-24, 26-30 (addressing and applying the two-part import concentration standard of the regional industry analysis) (citations omitted). *See also* Def.-Intervenor's Brief at 20 ("At no time can the Commission rely on a *per se* benchmark . . . . The Commission must assess . . . 'concentration' based on the facts on record").

In its prospective analysis, the Commission noted that "the proportion of total subject imports from Venezuela that entered the Florida region . . . declined during the period of review to levels the Commission previously . . . found insufficient to satisfy the concentration test." Commission Views at 26. It is not immediately clear that such language indicates a benchmark proportion, much less one at the sixty percent level.[31]

---

[31]Counsel for the Commission advises that the quoted sentence:

> is [one] that the Commission has in its opinion that we should not read that much into. It's an observation. There's a very similar sentence in the same opinion, when they're talking about the market isolation factors regarding the Japanese reviews, when they say the percentage is lower than the range that the Commission typically considers to satisfy the statutory market isolation criteria. In both cases, the Commission then went on at some length, after that, to discuss it, because these were, in both cases, fairly low ranges. So, that sentence, taken by itself, I think is just more of an observation leading into why it felt it needed to go into quite a bit of discussion.

Tr. at 89-90. *But see id.* at 94-95 (counsel for Venezuelan Cement stating that "when [the Commission is] talking about trends in 1997 to 1999 [after the Commission's statement about "levels the Commission previously has found insufficient to satisfy the concentration test"], it's not making a decision that those trends had any particular impact on its determination regarding 1997 to 1999. . . . I don't see that there is any fair way of reading the Commission's statement about the

Beyond the Government's general observation that the Commission has never found levels below sixty percent to be sufficient concentration, Venezuelan Cement points to no other evidence that the Commission relied on a "minimum benchmark" level of sixty percent in its regional industry analysis. Tr. at 10-11 (counsel for Venezuelan Cement referring to Def.'s Brief at 33, n.75) *See generally* Commission Views at 23-24, 26-30 (engaging in a prospective review of trends based on import concentration levels during the period of review). Venezuelan Cement's claim is thus without merit.

c.        Commission's Finding that Record Does Not Satisfy Import Concentration Standard

In the present case, the Commission majority found that "the percentage of total subject imports from Venezuela entering the Florida region fell substantially and steadily over the period of review, from 64 percent in 1997 to 53 percent in 1998 and 45 percent in 1999." Commission Views at 26. *See also* Def.'s Response Brief at 37, 38 ("Not only was the proportion of Venezuelan imports into the region low relative to other similar cases, but it declined substantially during the period of review in direct contrast to the substantial increases in the original investigation.").[32]

In addition, the Commission observed that, while similar volumes of subject imports from Venezuela entered the Florida region during the period of review and during the period reviewed in the original investigation, "the total volume of imports from Venezuela has substantially increased

_____

levels the Commission previously has found insufficient any other way than the way we have characterized them.").

[32]"In contrast, during the original investigations, the Florida region accounted for an increasing concentration of Venezuelan imports of cement, reaching 98 percent of total Venezuelan imports in 1991." Commission Views at 26-27. *See also* Def.'s Response Brief at 37.

and entered various U.S. markets other than the Florida region, in increasing volumes." Tr. at 52.

*See* Commission Views at 28 (during the period of review, the apparent cement consumption in Florida increased by 17.5 percent), 28-29 (in 1999, only 10.3 percent of apparent cement consumption in Florida was composed of cement from Venezuela (compared to 19.2 percent in 1991); *id.* at 26, 29 (while the volume of subject imports entering the Florida region steadily decreased from 64 percent to 45 percent during the period of review, the volume of subject imports into the entire U.S. market increased by 42.5 percent).[33]  Thus, the Commission determined that "concentration as a percentage of total imports has declined in the Florida region [during the period of review], not as a result of a decline in the volume of imports entering the Florida region, but because the level of total imports has increased." Tr. at 52-53.

Given these trends, and the prospective nature of "sunset" reviews, the Commission reasonably concluded that because subject import levels in the Florida region were not likely to account for a substantial proportion of total subject imports entering the United States," an import concentration would not exist in the reasonably foreseeable future. Commission Views at 27-30.[34]

---

[33]*Cf.* Separate Views at 77 ("While the proportion of total U.S. imports of Venezuelan Cement entering Florida has declined, Florida continues to be the primary U.S. market for Venezuelan cement . . . .").

[34]      [N]ot only did the 'substantial and steady' trend of decreasing exports to Florida culminate in 1999 with only 45 percent of Venezuela's imports to the United States going to Florida, but also the other conditions that characterize the Florida cement market, cement demand in Florida, the irrelevance of the suspension agreements to the price and volume of cement from Venezuela, and the import practices of Venezuelan exporters.  All of these factors were discussed by the Commission in reaching its conclusion that the concentration criterion of the law was not satisfied.

The Commission's consideration of the record evidence on an individualized basis, as directed by the SAA and legislative history of the URAA, is reasonable and is not an abuse of its discretion. The Commission's finding that import concentration does not exist because subject imports in the Florida region do not "account for a substantial proportion of total subject imports entering the United States" is supported by substantial evidence and is in accordance with law. SAA at 860.

B.      Commission's Finding that Subject Imports in Florida Region Are Unlikely to Increase if Suspended Investigations Are Terminated[35]

Venezuelan Cement next challenges the Commission's finding that subject imports in the Florida region are unlikely to increase if the suspended investigations are terminated. Pl.'s Brief at 43-55; Pl.'s Reply Brief at 29-45. *See* Commission Views at 27-30. *See generally* 19 U.S.C. § 1675(c)(1) (2000) (in a "sunset" review, the Commission must determine whether termination of suspended investigations "would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy . . . .").[36]

---

Def.-Intervenor's Brief at 25.

[35]Because the Commission did not find it likely that subject import levels in the Florida region would satisfy the import concentration standard in the foreseeable future if the suspended investigations are terminated, it could not proceed to the final requirement of its regional industry analysis, i.e., material injury in the Florida region. Commission Views at 30. *See* 19 U.S.C. § 1675(c)(1)(A) (2000); 19 U.S.C. § 1677(4)(C) (2000).

[36]Venezuelan Cement states that if the Commission had found a concentration of subject imports in the Florida region during the period of review, it would not have been necessary for the Commission to consider whether subject imports in Florida are likely to increase after the termination of the suspended investigations. Pl.'s Brief at 43; Pl.'s Reply Brief at 30 n.22. *See also* Tr. at 14-15, 23-24.

In order to determine the likelihood of continuation or recurrence of dumping or a countervailable subsidy, the Commission "must decide the likely impact in the reasonably foreseeable future of an important change in the status quo–the . . . termination of a suspended investigation and the elimination of the restraining effects of that . . . suspended investigation on volumes and prices of imports." SAA at 883-84.

"The determination called for in these types of reviews is inherently predictive and speculative." SAA at 883. *See, e.g.,* Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966) (holding that even if two inconsistent conclusions may be drawn from the evidence, the agency's interpretation may be supported by substantial evidence); Mitsubishi Materials Corp., 17 CIT at 304, 820 F. Supp. at 613 (stating that the Court will "affirm the determination of the Commission when

_____

First, whether or not the Commission finds import concentration during the period of review is not germane to this "sunset" review. *See supra* n.11 (in "sunset" review, Commission is not obligated to determine whether import concentration exists during the period of review). Instead, the Commission did what it ought to have done: it conducted a prospective analysis of import levels during the period of review. *See* Commission Views at 27 ("The Commission is not required in a five-year review to demonstrate that the regional industry criteria are currently satisfied. However, the record does not indicate that the proportion of total subject imports from Venezuela entering the Florida region is likely to satisfy the import concentration criteria if the suspended investigations are terminated.").

Second, the Commission was under a statutory mandate to consider whether subject imports in the Florida region would be likely to increase if the suspended investigations were terminated, *regardless* of its finding in its regional industry analysis. *See* 19 U.S.C. § 1675(c)(1)(A) (2000) (in a "sunset" review, the Commission determines whether "termination of the . . . suspended [investigations] would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy . . . *and* of material injury") (emphasis added); 19 U.S.C. § 1677(4)(C) (2000) (in a regional industry analysis, the Commission may find material injury in a regional industry "even if the domestic industry as a whole . . . is not injured"). *See also* 19 U.S.C. § 1675a(a)(8) (2000) (providing special rule for regional industries in a determination of likelihood of continuation or recurrence of material injury). *See generally* Def.-Intervenor's Brief at 26 n.83.

it is reasonable and supported by the record as a whole, even where there is evidence which detracts from the substantiality of the evidence") (*citing* <u>Atlantic Sugar, Ltd.</u>, 744 F.3d 1556 (Fed. Cir. 1984)). *See generally* Def.'s Response Brief at 40-42 (discussing the likelihood standard to the regional industry provision).

With respect to the Commission's finding, Venezuelan Cement contends: 1). the Commission should have considered import concentration levels outside the period of review (i.e., before and after the investigations were suspended); and 2). the Commission should not have concluded that the suspension agreements had "no appreciable effect on relative subject import levels within and outside of the Florida region." <u>Commission Views</u> at 28.

1.      Consideration of Record Evidence Outside the Period of Review

Venezuelan Cement claims that the Commission is legally obligated to consider "the level of import concentration prior to an agreement as circumstantial evidence of what is likely to happen if the agreement is terminated." Pl.'s Brief at 47-48; Pl.'s Reply Brief at 32. Further, Venezuelan Cement suggests that the Commission erred by "improperly giving conclusive evidentiary weight to the pattern of distribution of imports from Venezuela during 1997-1999 and disregarding record evidence of changes in the distribution of such imports that occurred during the years immediately following acceptance of the agreements." Pl.'s Reply Brief at 30. *See also id.* at 32, 35, 38. It appears that Venezuelan Cement's arguments reflects a general concern that the Commission's determination is not reasonably based on the record when viewed in its entirety. *See* Pl.'s Brief at

44-46; Pl.'s Reply Brief at 30-33.[37]  To the contrary, the Commission acted properly.

a.      Consideration of Evidence Prior to the Acceptance of the Suspension Agreements

In particular, Venezuelan Cement claims that the Commission failed to consider the motivations of the Venezuelan importers in reaction to the impending "sunset" review.  Pl.'s Brief at 46-47.  Venezuelan Cement avers that

> the decline in Florida's share in 1997 to 1999 was a predictable result of the new statutory requirement that the Commission conduct a sunset review.  Knowing the review would likely be based on a Florida regional industry, Venezuelan exporters had to be aware that one of their best chances for prevailing in the Sunset Review was to defeat the import concentration requirement.

Tr. at 21.  *See also* Tr. at 22 ("The fact that Florida's share declined is most easily explained by the Venezuelan producers' efforts to position themselves favorably for the Sunset Review.").

The Commission may certainly consider the "likely behavior of . . . foreign exporters and the importers in the event the [suspension agreement is terminated]."  *See, e.g.,* Am. Permac, Inc. v. United States, 831 F.2d 269, 274 (Fed. Cir. 1987) (citation omitted) (in order to determine whether to revoke or deny an antidumping order, Commission "forecasts the likely behavior of the foreign exporters and the importers in the event the order is revoked or modified. . . . . Since the principal

---

[37]*See, e.g.,* Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1954) ("Congress has . . . made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."); Atlantic Sugar, Ltd., 744 F.2d at 1562 ("Substantial evidence on the record means 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence.") (*citing* SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n, 718 F.2d 365, 382 (Fed. Cir. 1983)).

focus of this phase of the investigation is on the future behavior of the foreign exports and the importers, their intentions are very important"). However, whether the Commission's failure to do so upsets the reasonableness of its determination is another issue. *See, e.g.,* Tr. at 22.

In particular, Venezuelan Cement relies on Matsushita, in which the Commission's decision not to revoke or modify an antidumping order was reversed because the determination was not supported by substantial evidence. Matsushita Elec. Indus., 750 F.2d at 928. In particular, the Federal Circuit found that, due to the prospective nature of the agency's review,

> [i]n no case will the Commission ever be able to rely on concrete evidence establishing that, in the future, certain events *will* occur upon revocation of an antidumping order. Rather, the Commission must assess, based on *currently available evidence and on logical assumptions and extrapolations flowing from that evidence*, the likely effect of revocation of the antidumping order on the behavior of the importers.

Matsushita Elec. Indus., 750 F.2d at 933 (emphasis added). *See also* Tr. at 21-22 (counsel for Venezuelan Cement noting that according to Matsushita, "it is often necessary in a review proceeding to rely on circumstantial evidence of the foreign producers' incentives or motivations, which the Court said are always relevant and, indeed, may be more reliable than self-serving declarations").

In the present case, it appears that the Commission has no clear explantion why volumes of subject imports in the Florida region remained static, while the Florida and U.S. markets grew.[38]

---

[38]During the oral argument, counsel for the Commission was asked why the import volumes from Venezuela in the Florida region remained the same, while the Florida market and U.S. market grew. Tr. at 53, 62. Counsel for the Commission stated that the Commission "saw there was no reason [for the market] to shift[ ] because regional industry investigation does not and the suspension agreements did not limit any kind of restraint on the Florida region versus . . . the rest of the United States." Tr. at 53. *See id.* at 54 (counsel for the Commission postulating that subject imports from

Venezuelan Cement offers what may be a plausible reason: the Venezuelan exporters reacted to the impending sunset review by choosing not to increase the volumes of subject imports into the Florida market. *See, e.g.,* Tr. at 21-22. However, the record contains little evidence supporting Venezuelan Cement's theory. *See, e.g.,* Tr. at 60 (counsel for the Commission stating that "Plaintiffs could not only provide us anything more than their conjecture. They also could not provide us any evidence, even in their allegations, . . . if imports left any of these other markets, why they would come back to Florida, or why they would come to Florida."); 65 (counsel for the Commission stating "there's nothing to show, no evidence. There has been nothing offered by Plaintiffs of any kind of evidence that . . . extra volume, despite the fact that demand was–was up, but that extra volume from Venezuela would have entered the Florida market.").[39]

---

Venezuela were being shipped to the U.S. market because "[t]here was demand in other parts of the United States"), 59 ("[T]he Commission doesn't have any evidence that it wasn't . . . just because the Venezuelan exporter decided to export more to the U.S. market and decided to move into other markets of the United States, other than the Florida region, which is what it . . . seemed to have . . . did. . . . [T]hat's what the evidence showed."). *See also id.* at 54 (the Court stating that "the record is silent" with respect to an answer to its inquiry), 84-85 (the Court repeated its inquiry to counsel for Vencemos, to which counsel replied "the record shows . . . that the sales outside of Florida were profitable, that the customer base in Florida was not unlimited").

[39]Counsel for Venezuelan Cement claims that it "pointed out . . . several ways in which the [suspension] agreement did constrain the imports." Tr. at 101. *See also id.* (counsel for Venezuelan Cement stating that "the questionnaire responses and the statements made by the Venezuelan exporters to the Commerce Department, which were put in the record of the Commission's proceeding, indicated that there was, in fact, a constraint imposed by the suspension agreements."). Venezuelan Cement then concluded that "this was strong, very strong circumstantial evidence that the suspension agreements were the cause. But the Commission did not, in fact, even address that." *Id. But see* Tr. at 111 (counsel for Vencemos pointing out that "[t]he Commission clearly, in its opinion, indicates it looked at the evidence. It looks at all the evidence that's before it. It just found that because it was mixed, it wasn't compelling, and it was looking more at the trends than it was at specifics, the specific contracts or the allegations about the motivations [of the Venezuelan exporters]. So, it's not that they didn't look at them . . . ."), 112 (same).

Given this relative dearth of evidence, there is no reason why the Commission is obligated

to consider Venezuelan Cement's conjecture without the benefit of evidence. *See* Matsushita, 750

F.2d at 933 (the Commission must based its assessment on "currently available evidence and on

logical assumptions and extrapolations flowing from that evidence").[40]  Simply put, based on the

record before it, the Commission reasonably determined that subject imports from Florida would not

be likely to increase in the foreseeable future once the suspended investigations are terminated. *See,*

*e.g.,* Tr. at 58-59.  *See generally* Tr. at 61-68.

  b.     Consideration of Events Immediately After the Acceptance of the Suspension
         Agreements

Consistent with the Commission's discretion to determine import concentration on an

"individualized case-by-case method of analysis," there is nothing in the statute or legislative history

to support Venezuelan Cement's contention that the Commission is obligated to consider the change

in import volume and import concentration that occurred immediately after the acceptance of the

---

[40]Far from requiring the Commission to consider the circumstantial evidence of foreign incentives or motivations, as Venezuelan Cement appears to suggest, Matushita "speaks to a . . . different issue." Tr. at 112. In Matsushita, after the Commission received "testimony" by counsel for the importers, the subject imports

  increased 400 percent in one quarter, effectively negating counsel's assurances that
  imports would not increase and counsel's arguments that the decreased volume of
  [subject imports] was an 'irreversible trend' unrelated to the dumping finding. . . . .
  Since the importers chose not to provide any direct evidence on their intent, the
  Commission had no choice but to rely on circumstantial evidence from which to infer
  likely intent.

Matsushita Elec. Indus., 750 F.2d at 933-34.  *See also* Tr. at 112.  Similar factual circumstances are not present in this action.

suspension agreements.  Texas Crushed Stone II, 35 F.3d at 1542.  *See* Pl.'s Reply Brief at 30, 32, 35, 38, 40.  Because the statute does not prescribe a particular method of analysis,"Congress [must have] intended for the Commission to exercise its discretion in this fact specific area of analysis."  Texas Crushed Stone I, 17 CIT at 434, 436, 822 F. Supp. at 778, 780.  *See* Chevron, 467 U.S. at 843.  *See generally* 19 U.S.C. § 1677(4)(C) (2000).

However, the Commission is required to consider "whether any improvement in the state of the industry is related to the . . . suspension agreement."  19 U.S.C. § 1675a(a)(1)(B) (2000).  According to the SAA, "the Commission should not determine that there is no likelihood of continuation or recurrence of injury simply because the industry has recovered after the imposition of an order or acceptance of a suspension agreement, because one would expect some beneficial effect on the industry."  SAA at 884.  *See also id.* (commenting that "an improvement in the state of the industry related to . . . [a] suspension agreement may suggest that the state of the industry is likely to deteriorate if the order is revoked or the suspended investigation terminated").[41]  The Commission did observe that "imports of gray portland cement from Venezuela into the Florida region during the period of review [were] at a level only slightly above that in 1991, immediately prior to the acceptance of the suspension agreements."  Commission Views at 28.  However, its final determination is based on a variety of factors, such as the consistent decline in subject import levels into the Florida region during the period of review.  *See generally id.* 26-30.

---

[41]Because "one would expect that the imposition of an order or acceptance of a suspension agreement would have some beneficial effect on the industry," Venezuelan Cement's suggestion that the Commission should consider events occurring immediately after the acceptance of the suspension agreements would not likely yield very useful information.  SAA at 884.

Congress has made it clear that "[a]s in the case of injury and threat determinations, the Commission must consider all factors, but no one factor is necessarily dispositive." SAA at 886. *See* 19 U.S.C. § 1675a(a)(5) (2000) (providing that "[t]he presence or absence of any factor which the Commission is required to consider under this subsection shall not necessarily give decisive guidance with respect to the Commission's determination of whether material injury is likely to continue or recur within a reasonably foreseeable time if . . . the suspended investigation is terminated"). *See also* Floral Trade Council v. United States, 20 CIT 595, 601 (1996) (citation omitted) ("As trier of fact, the Commission must assess the quality of the evidence and give such weight to the evidence that it believes is justified."); Matsushita Elec. Indus., 750 F.2d at 933 ("The Commission's decision does not depend on the 'weight' of the evidence . . . . the question is whether there was evidence which could reasonably lead to the Commission's conclusion, that is, does the administrative record contain substantial evidence to support it and was it a rational decision?").

2.      Commission's Finding that Suspension Agreements Have No Appreciable Effect On Import Concentration in the Florida Region

Venezuelan Cement also contests the Commission's overall conclusion that "the existence or absence of these suspension agreements has no appreciable effect on relative subject import levels within and outside of the Florida region." Commission Views at 28. *See* Pl.'s Brief at 44 ("Because it found that the decrease in Florida's share of imports from Venezuela was not the result of the suspended investigations, the Commission concluded that termination of the investigations would not result in increasing the percentage of such imports shipped into Florida."). *See also* Pl.'s Brief at 48-55; Pl.'s Reply Brief at 41-45.

In its prospective analysis, the Commission found that "the record does not indicate that marketing and distribution patterns have been affected by the acceptance of the suspension agreements. Commission Views at 27. In particular, the Commission noted that because subject imports from the Florida region during the period of review did not "provide any incentive to ship subject imports to customers outside of the Florida region as opposed to those within that region," the suspension agreements "had no appreciable effect on relative subject import levels within and outside of the Florida region." Commission Views at 28.

According to Venezuelan Cement, "[t]he fact that the suspension agreements did not include any formal constraints or incentives that would have caused imports from Venezuela to shift away from Florida during [the period of review] did not logically lead to the Commission's conclusion that the agreements had 'no appreciable effect' whatsoever." Pl.'s Reply Brief at 42. Instead, "the agreements could have affected the regional distribution of imports from Venezuela in some other way." *Id. See, e.g.,* Pl.'s Brief at 49 (claiming that "[t]he suspension agreements . . . had a clear impact on increasing the prices of imports from Venezuela"); Tr. at 19-20 (same).

For example, Venezuelan Cement claims that an "immediate effect of the agreements was to shift imports from Venezuela away from Florida to other parts of the United States." *Id.* Therefore, Venezuelan Cement concludes, the suspension agreements resulted in a "dramatic alteration in shipping patterns [by causing] Venezuelan exporters to cease targeting Florida and to disperse their sales more broadly around the southeastern and mid-Atlantic states." *Id.* at 50. *See also* Pl.'s Reply Brief at 42 ("[T]he lack of a formal constraint or incentive should have led the Commission to ask what motivated the Venezuelan exporters to make such a dramatic shift in the

U.S. destinations of their imports, a question the Commission did not ask.").

Venezuelan Cement thus argues that the Commission's determination is erroneous by pointing to other possible outcomes based on the record evidence. *Compare, e.g.,* Def.'s Response Brief at 47-48 (the Commission found that the substantial and steady decline of subject imports from Venezuela into the Florida region during the period of review was "not a result of a decline in the volume of imports entering the Florida region, but rather because the level of total imports has increased") *with* Pl.'s Brief at 51 (Venezuelan Cement explains the decrease in Florida's share of imports from Venezuela as "a predictable consequence of the Commission's impending sunset review"), 51-54 (offering the alternative interpretation that such a decline was a matter of course because the Venezuelan exporters reacted to the impending "sunset" review by "seek[ing] to shift their exports away from Florida in the years immediately preceding the sunset review in order to position themselves favorably for the review.").

However, a reasonable agency determination supported by substantial evidence and in accordance with law cannot be overturned on such grounds. 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). *See* Def.'s Response Brief at 51. As the SAA explains:

> [t]he possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of dumping or countervailable subsidies, or injury, is erroneous, as long as the determination of likelihood of continuation or recurrence is reasonably in light of the facts of the case.

SAA at 883. *See, e.g.,* Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966) (holding that even if two inconsistent conclusions may be drawn from the evidence, the agency's interpretation may be supported by substantial evidence).

In addition, Venezuelan Cement objects to the Commission's observation that "the

suspension agreements did not include any formal constraints or incentives that would have caused imports from Venezuela to shift away from Florida" during the period of review because such circumstances exist in every "sunset" review of a suspension agreement involving a regional industry. Pl.'s Reply Brief at 42. *See also* Pl.'s Brief at 54.[42] As a result, Venezuelan Cement finds no logical connection between the lack of formal constraints or incentives and the Commission's conclusion that the suspension agreements had no appreciable effect on the import concentration level in the Florida region. *See* Pl.'s Reply Brief at 42. However, the Commission's determination is not based on any one piece of record evidence.[43] As the Federal Circuit noted, the Court will

---

[42]Specifically, the Commission noted that

> [t]he imports of Venezuelan cement have been subject to an antidumping suspension agreement that established a floor price. There has been no cash deposit requirement under the countervailing duty suspension agreement. Thus, the Venezuelan suspension agreements do not limit the quantity of subject imports that can enter the Florida region, or in fact the entire U.S. market, at fairly traded prices. There is no indication on the record that these agreements provide any incentive to ship subject imports to customers outside of the Florida region as opposed to those within that region.

Commission Views at 27-28 (citations omitted). *See id.* at 29 (noting that "there is no evidence to indicate that import patterns likely would shift toward more concentration in the Florida region if the suspended investigations were terminated"). *See also* Tr. at 52 ("An important factor in the Commission's finding that Venezuelan imports likely would not shift toward more concentration in the Florida region if the suspended investigations were terminated was the fact of the similarity in the volume of Venezuelan imports into the Florida region during the original investigation and during the review. The volumes during the period of review were very similar to the 1991 volume in the original investigation."), 56 ("The Commission . . . determined that there was never any evidence that would show that . . . there was a reason for those imports to return to the Florida [region]–or, not return, but more of them to go into the Florida market, because they very easily could have gone into the Florida market during the suspension agreements.").

[43]"As in the case of injury and threat determinations, the Commission must consider all factors, but no one factor is necessarily dispositive." SAA at 886.

"affirm the determination of the Commission when it is reasonable and supported by the record as a whole, even where there is evidence which detracts from the substantiality of the evidence." Mitsubishi Materials Corp., 17 CIT at 304, 820 F. Supp. at 613 (*citing* Atlantic Sugar, Ltd., 744 F.2d 1556 (Fed. Cir. 1984)).

Therefore, the Commission's reasonable determination that subject imports from the Florida region would not increase if the suspended investigations were terminated is supported by substantial evidence on the record and is in accordance with law.

> C.      Commissioner Miller's Decision Not to Cumulate the Volume and Effect of Imports From Venezuela

Finally, Venezuelan Cement argues that Commissioner Miller abused her discretion by declining to cumulate the volume and effect of imports from Venezuela. Pl.'s Brief at 56-67. *See* Separate Views at 78-79. However, Commissioner Miller's decision does not affect the disposition of the Commission's negative determination, because the determination of the Commission majority is sustained as supported by substantial evidence and is otherwise in accordance with law. *See, e.g.,* Far E. Textile, Ltd. v. United States, No. 00-06-00296, 2001 Ct. Int'l Trade LEXIS 106, at 29 (Aug. 14, 2001) ("Where a majority of the commissioners render . . . determinations that are . . . deemed supported by substantial evidence and are in accordance with law, the Court need not reach the propriety of a concurring commissioner's determination, as the ultimate determination would not be disturbed in any event."); Titanium Metals Corp. v. United States, 25 CIT __, __ n.9, 155 F. Supp.2d 750, 758 n.9 (2001) (finding harmless error where a commissioner relied on dumping margins that the Commission majority did not rely on in its decision). There is, therefore, no need to reach this

final issue.

## V. Conclusion

For all the reasons set forth above, the Commission's negative final determination is supported by substantial evidence on the record and is in accordance with law. Plaintiff's motion for judgment on the agency record is therefore denied and the Commission's negative final determination in Gray Portland Cement and Cement Clinker from Venezuela, 65 Fed. Reg. 68,974 (Dep't Commerce Nov. 15, 2000) is sustained. This action is dismissed.

Judgment will enter accordingly.

 

_____

Delissa A. Ridgway
Judge

Decided:   July 28, 2003
               New York, New York